133 T.C. No. 8


UNITED STATES TAX COURT


CAPITAL ONE FINANCIAL CORPORATION AND SUBSIDIARIES,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19519-05, 24260-05.  Filed September 21, 2009.


P's subsidiaries, COB and FSB, issued Visa and MasterCard credit cards.  Among the various revenues received from the credit card business, COB and FSB earned interchange.  Interchange is income earned by an issuer of Visa and MasterCard credit cards which accrues to the issuer each time a cardholder uses a credit card for a purchase.  It is almost always calculated as a percentage of the total purchase plus, in some instances, a small fixed amount.

When a cardholder used a credit card to purchase an item from a merchant, the cardholder agreed to pay COB or FSB the full purchase price of the item. However, because of the way the Visa and MasterCard systems operated, COB and FSB authorized Visa and MasterCard to withdraw a lesser amount from Capital One's account which eventually was delivered to the merchant.  The difference between the purchase price

and the amount Visa or MasterCard withdrew from Capital One's account was the interchange on the transaction.

COB and FSB treated interchange as creating or increasing original issue discount (OID) on the pool of loans to which the interchange related under sec. 1272(a)(6)(C)(iii), I.R.C.  R argues that interchange is a fee for a service paid by the merchant or the merchant's bank, and not by the borrower.  Furthermore, R argues that interchange is not economically equivalent to interest and therefore may not be treated as OID under sec. 1272(a)(6)(C)(iii), I.R.C.  Ps argue that COB and FSB acquired the credit card loans at a discount, the discount being the amount of interchange, and therefore interchange was properly treated as OID.

In our previous Opinion in this case, Capital One Fin. Corp. v. Commissioner, 130 T.C. 147 (2008), we held that a taxpayer was required to follow all procedures put in place by the Commissioner to change its method of accounting in accordance with sec. 1272(a)(6)(C)(iii), I.R.C.  FSB did not request to change its method of accounting by filing Form 3115, Application for Change in Accounting Method, with its return.

Sec. 1272(a)(6)(C)(iii), I.R.C., provides a specific formula by which OID accruals should be calculated on a debt instrument subject to prepayment such as a pool of credit card loans.  Sec. 1272(a)(6)(C)(iii), I.R.C. requires the use of a prepayment assumption.  COB used a formula developed by the accounting firm KPMG (KPMG model).  R raises several issues with respect to the KPMG model, arguing that it did not comply with sec. 1272(a)(6)(C)(iii), I.R.C., and that the results produced by the model were unreasonable.

COB and FSB issued certain Visa and MasterCard credit cards known as Milesone cards which allowed cardholders to earn 1 mile for every dollar used for a purchase transaction, with certain limitations.  A cardholder earned no miles for fees or finance charges incurred.  When a cardholder reached a certain number of miles, they could be redeemed for airline tickets. COB and FSB deducted the estimated future cost of redeeming the miles under sec. 1.451-4, Income Tax

Regs., which allows a taxpayer to deduct from sales revenues an estimate of the expenses associated with redeeming coupons that were issued with sales.

Held: Interchange is not a fee for any service other than the lending of money. The issue price of a credit card loan is the price paid for the loan, which is the amount withdrawn from COB's and FSB's account and deposited with the merchant's bank. Therefore, interchange is properly treated as OID under sec. 1272(a)(6)(C)(iii), I.R.C.

Held, further: FSB did not follow the required procedures to change its method of accounting in accordance with sec. 1272(a)(6)(C)(iii), I.R.C. Therefore, FSB may not treat interchange and overlimit fees as OID.

Held, further: The KPMG model did not comply with sec. 1272(a)(6), I.R.C., in that: (1) The model included in the beginning issue price of the debt instrument additions to principal which occurred after the first day of the accrual period; (2) the model incorrectly calculated the payment rate by including additions to principal which occurred after the first day of the accrual period; and (3) the model incorrectly calculated the payment rate by applying payments to finance charges which accrued during the period. Payments should first be applied to the prior month's accrued finance charges, and not the current month's finance charges. In all other respects, the KPMG model was reasonable.

Held, further: The miles issued by COB and FSB were not issued with sales, and COB and FSB did not have gross receipts with respect to sales within the meaning of sec. 1.451-4, Income Tax Regs. Therefore, they may not deduct the estimated costs of redeeming the miles pursuant to sec. 1.451-4, Income Tax Regs., but must do so under the all events test as to those amounts that are fixed and known and for which economic performance has occurred.

Jean Ann Pawlow, Elizabeth A. Erickson, Holly K. Hemphill, Kevin Spencer, and Robin L. Greenhouse, for petitioners.

Gary D. Kallevang, James D. Hill, and Alan R. Peregoy, for respondent.

CONTENTS

Issue 1:  Interchange . . . . . . . . . . . . . . . . . . .     8

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . .     8
     A.   An Introduction to Interchange . . . . . . . . .     8
     B.   The Historical Roots of the Credit Card
          Industry and Interchange . . . . . . . . . . .      9
     C.   Interchange Fees and the Visa and
          MasterCard Systems . . . . . . . . . . . . . .     12
     D.   The Parties to a Typical Credit Card Purchase
          Transaction . . . . . . . . . . . . . . . . . .    12
          1.   The Issuing Bank (Capital One) . . . . . .    12
          2.   The Cardholder . . . . . . . . . . . . . .    13
          3.   The Acquiring Bank. . . . . . . . . . . . .   14
          4.   The Merchant . . . . . . . . . . . . . . .    15
          5.   The Association (Visa or MasterCard) . . .    15
     E.   A Typical Credit Card Purchase Transaction . . .   15
     F.   The Clearing Process . . . . . . . . . . . . .     19
     G.   Net Settlement . . . . . . . . . . . . . . . .     20
     H.   Cardholder Payments . . . . . . . . . . . . . .    23
     I.   Merchant Discount in Detail . . . . . . . . . .    25
     J.   Interchange in Detail . . . . . . . . . . . . .    26
          1.   Factors Influencing Interchange Rates . . .   26
          2.   Capital One's Costs and Interchange . . . .   28
          3.   Debit Cards and Interchange . . . . . . . .   29
          4.   Capital One's Accounting Treatment of
               Credit Card Purchases and Associated
               Interchange Income . . . . . . . . . . . .    30
OPINION  . . . . . . . . . . . . . . . . . . . . . . . . .    33
     A.   An Overview of the Issue and the Law . . . . . .   33
     B.   The SRPM of a Credit Card Loan . . . . . . . . .   34
     C.   The Issue Price of a Credit Card Loan . . . . .    35
          1.   Whether Interchange Is a Fee for a Service
               (and If So, What Service) or Economically
               Equivalent to Interest . . . . . . . . . .    36
          2.   Whether the Cardholder, the Merchant, or
               the Acquiring Bank Pays Interchange . . .     48
     D.   Conclusion With Respect to the Interchange Issue .  52

Issue 2:  The Calculation of OID Under Section
          1272(a)(6)(C) . . . . . . . . . . . . . . . . . .  53

        FINDINGS OF FACT . . . . . . . . . . . . . . . . . .  53
              A.   Accounting Methods . . . . . . . . . . . .  53
              B.   Income and OID Accruals of Overlimit Fees
                   and Interchange . . . . . . . . . . . . .  54
        OPINION . . . . . . . . . . . . . . . . . . . . . . .  55
              A.   Accounting Methods . . . . . . . . . . . .  55
              B.   The Standard of Review . . . . . . . . . .  57
              C.   Section 1272(a)(6)(C) . . . . . . . . . . .  59
              D.   The KPMG Model . . . . . . . . . . . . . .  62
                   1.   The Payment Rate or Prepayment
                        Assumption . . . . . . . . . . . . .  62
                   2.   The Weighted Average Maturity . . . .  64
                   3.   The Yield to Maturity . . . . . . . .  65
                   4.   OID Accrual . . . . . . . . . . . . .  66
                   5.   An Adjustment for Writeoffs . . . . . .  67
                   6.   The Mid-Month Convention . . . . . . .  67
                   7.   The KPMG Model Table . . . . . . . . .  67
              E.   Respondent's Arguments With Respect to the
                   KPMG Model . . . . . . . . . . . . . . . .  69
                   1.   The Monthly Retirement and Reissuance
                        of the Pooled Debt Instrument . . . .  69
                        a.   COB's Reasons for Adopting the
                             "Retired and Reissued" Approach.  71
                        b.   Respondent's Alternative to the
                             "Retired and Reissued" Approach.  72
                   2.   The Inclusion of New Additions in the
                        Beginning Issue Price . . . . . . . .  78
                   3.   Payment Rate Issues . . . . . . . . .  82
                        a.   The Denominator . . . . . . . . .  82
                        b.   The Numerator . . . . . . . . . .  84
                        c.   Other Published Payment Rates . .  86
                   4.   Dr. Hakala's Default Rate Adjustment
                        for Overlimit Fees . . . . . . . . .  87
                   5.   Dr. Hakala's Seasonality and
                        Trend Adjustment . . . . . . . . . .  90
              F.   Conclusion With Respect to the
                   Calculation of OID . . . . . . . . . . . .  91

Issue 3:  Milesone Rewards . . . . . . . . . . . . . . . . . .  91

        FINDINGS OF FACT . . . . . . . . . . . . . . . . . .  91
              A.   The Milesone Reward Program . . . . . . . .  91
              B.   Milesone Program Costs and Accounting . . .  93
        OPINION . . . . . . . . . . . . . . . . . . . . . . .  95

A.    The History of Accounting for the
        Redemption of Trading Stamps and
        Coupons  . . . . . . . . . . . . . . . . . . .  95
B.    The "With Sales" Requirement  . . . . . . . .  98
C.    Gross Receipts With Respect to Sales  . . . . 102
D.    Conclusion With Respect to the Milesone
        Rewards Issue  . . . . . . . . . . . . . . . 104

HAINES, Judge:  Respondent determined deficiencies in, and penalties with respect to, petitioners' Federal income taxes as follows:[1]

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 1995 | $1,459,146 | N/A |
| 1996 | 7,162,060 | N/A |
| 1997 | 37,656,474 | $5,487,734 |
| 1998 | 72,995,902 | 5,220,381 |
| 1999 | 175,286,436 | 13,194,525 |

Capital One Financial Corp., through its principal subsidiaries Capital One Bank (COB) and Capital One, F.S.B. (FSB) (collectively Capital One),[2] is among the world's largest issuers of Visa and MasterCard credit cards.  Its headquarters is in Virginia.  After concessions,[3] three issues remain for our decision, all of which are issues of first impression and relate

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code), as amended.  Rule references are to the Tax Court Rules of Practice and Procedure.

[2]We refer to COB and FSB individually only when the difference is material to our analysis.

[3]The parties were able to settle many issues, including all issues with respect to petitioners' 1995 and 1996 tax years.

to the proper tax treatment of Capital One's income and expenses from its credit card business.

The first issue is whether certain credit card income, known as interchange, is properly recognized at the time the interchange accrues under the all events test (when the cardholder's credit card purchase is settled through either the Visa or MasterCard system) or whether it is properly recognized over the anticipated life of the pool of credit card loans to which the interchange relates under section 1272(a)(6)(C)(iii). We hold that interchange may be recognized over time as original issue discount (OID) under section 1272(a)(6)(C)(iii).

The second issue is whether COB and FSB properly calculated the amount of OID for interchange and overlimit fees.[4]  We hold that the formula COB used to calculate OID, with modifications required by the OID rules generally and section 1272(a)(6) specifically, as set forth infra, is reasonable.

The third issue is whether Capital One may deduct under section 1.451-4, Income Tax Regs., the estimated cost of future redemptions of "miles" it issued to certain cardholders which could be redeemed for airline tickets.  We hold that Capital One

---

[4]Subsumed in this issue is whether FSB is precluded from treating interchange and overlimit fees as creating or increasing OID on the pool of loans to which it relates because it did not request to change its method of accounting.  We hold that FSB did not request to change its method of accounting and may not treat interchange or overlimit fees as OID.

may not deduct those costs pursuant to section 1.451-4, Income Tax Regs., but must do so under the all events test as to those amounts that are fixed and known and for which economic performance has occurred.

The parties have stipulated many of the facts and they are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein. For the most part the three issues are discrete, and for convenience we have set forth below separately our Findings of Fact and Opinion for each issue.

Issue 1:  Interchange

FINDINGS OF FACT

A.   An Introduction to Interchange

Interchange is income earned by an issuer of MasterCard or Visa credit cards which accrues to the issuer every time a cardholder uses a card for a purchase. Interchange is typically calculated as a percentage of the total amount of the purchase plus, in most but not all instances, a small fixed fee.

To better understand interchange, respondent suggests we review how and why interchange developed and the contractual relationships between the multiple parties in a credit card transaction, as well as the interchange systems in other payment card systems such as signature debit cards and personal identification number (PIN) debit cards. Petitioners, on the other hand, would have us focus on the economics of the credit

card transaction, specifically the cashflows.  In making our determination, we do not limit our analysis to one aspect or one viewpoint of the interchange system.

B.    The Historical Roots of the Credit Card Industry and
      Interchange

Payment card systems, like those of Visa and MasterCard, facilitate transactions between merchants and cardholders.  They allow consumers a convenient way to purchase goods without having to carry cash or use a check.  Merchants also benefit from payment card systems because they open themselves up to more potential consumers and they receive some assurance of payment and protection from fraud.

Hotels, gas companies, and department stores began issuing payment cards to some of their customers in the early 20th century.  Such a card was usually accepted only by the merchant who issued the card.  Some of the payment cards offered their cardholders a line of credit, while others required the cardholder to pay the balance in full by a fixed date, for example 30 days after a monthly statement was issued.[5]

In the 1950s a new type of payment card system was created, Diner's Club, and shortly thereafter American Express created a similar system.  Unlike previous cards issued by a single

---

[5]Cards that require full payment and do not allow cardholders to carry a balance from month to month are known in the banking industry as charge cards.

merchant, Diner's Club and American Express cards were accepted by many different merchants if the merchant had joined the respective system. Diner's Club adopted the following price structure, known by some in the payment card industry as a "merchant's pay" structure: cardholders paid a $3 annual fee and the merchants received 93 percent of the cardholder's total charge.[6] The difference between the amount of the cardholder's charge and the amount the merchant received was retained by the issuer and was known as merchant discount. American Express set a slightly higher annual fee and smaller merchant discount than Diner's Club.

The Diner's Club and American Express systems involved three parties: the cardholder, the merchant, and the card issuer. In these systems the card issuers not only issued cards to cardholders; they also recruited merchants to join the system and processed the card transactions. Of the various payment card systems, this three-party system is known as the "go it alone" system because the card issuer performed the various functions necessary to operate the system.

In 1958 Bank of America also chose to go it alone and began issuing its own payment cards, called BankAmericards, which were credit cards in that cardholders could carry a balance from month

---

[6]As we will see, respondent argues that the merchant has paid 7 percent of the charge to the bank, and petitioners argue that the bank has received funds net of a 7-percent discount.

to month.  Later on, in an effort to compete with Diner's Club and American Express, Bank of America franchised its cards to selected banks across the country.  Each franchisee operated the program independently using the BankAmericard name, and participating merchants accepted all cards carrying the name whether they were issued by Bank of America or one of the franchisees.  Franchisees paid Bank of America .5 percent of purchase volume plus a franchise entry fee.  This was known as the franchise model.

 A third model developed in the 1960s, the bank association. The idea was that banks would cooperate at the card system level by setting operational standards and fees.  Each bank would compete for cardholders as well as merchants.  The association members agreed that a cardholder carrying a card issued by any member bank could use the card at a merchant signed up by any member bank.  The banks also cooperated in promoting the card brand name which involved making the association's name more prominent on the card than the individual bank's name.  Several associations developed in the 1960s, the most enduring of which was the Interbank Association, which issued Master Charge cards. By the late 1960s banks were rushing to become either BankAmericard franchisees or Interbank Association members. Ultimately, most banks preferred being members of an association rather than franchisees.  Bowing to this pressure, in 1970 Bank

of America converted its franchise system into an association, National BankAmericard, Inc.  National BankAmericard, Inc., became Visa in 1976 and the Interbank Card Association became MasterCard in 1979.

C.    Interchange Fees and the Visa and MasterCard Systems

A credit card transaction in the Visa and MasterCard (the associations) systems included five parties.[7]  In the three-party go it alone model, the card issuer, for example American Express, would set a merchant discount rate acceptable to both parties, maximizing the bank's profits.  In the five-party association model the bank that issued the card was usually not the bank that recruited the merchant, and each sought to maximize profits, often at the other's expense.  The interchange system was created to solve that problem.

D.    The Parties to a Typical Credit Card Purchase Transaction

To explain how interchange works, we begin with a description of the five parties to a typical credit card purchase transaction under either the Visa or MasterCard system.

1.    The Issuing Bank (Capital One)

During the years at issue Capital One was an issuing bank, in that it issued cards to cardholders, but it did not recruit merchants to join the system.  The issuing bank's primary service

---

[7]The association model is sometimes referred to as a four-party system because the association, either Visa or MasterCard, is not counted.

was lending money to its cardholders with whom it had a contractual relationship as spelled out in the cardholder agreement. All issuing banks operated under the rules provided by the respective associations, either Visa's By-Laws and Operating Regulations (Visa rules) or MasterCard's By-Laws and Rules and Operating Manuals (MasterCard rules).

### 2. The Cardholder

The cardholder received a card from the issuing bank. The credit card evidenced a line of credit that had been established by the issuing bank upon which the cardholder could draw to purchase goods or services and in some cases transfer a balance or obtain a cash advance. The amount of the line of credit and the terms and conditions for use of the line of credit were provided in the cardholder agreement. The relationship between the cardholder and Capital One was also described in solicitation materials sent to the cardholder and the application filled out by the cardholder when applying for a Capital One credit card.

Under the terms and conditions of Capital One's cardholder agreements, Capital One promised to extend credit on a revolving basis to the cardholder in exchange for the cardholder's promise to pay Capital One the total price of the goods and services purchased by the cardholder using the Capital One card, along with any finance charges and fees as provided under the terms of the cardholder agreement. If a cardholder failed to pay an

amount owed, Capital One could not look for payment of the liability from the association, the merchant, or the acquiring bank.

### 3. The Acquiring Bank[8]

An acquiring bank recruited, screened, and accepted merchants into the associations' credit card systems. An acquiring bank entered into agreements with merchants regarding the merchants' acceptance of credit cards (merchant agreement). The acquiring bank's contractual relationship with the merchant was separate and distinct from the acquiring bank's relationship with the association. Neither Capital One, the cardholder, nor the association was a party to the agreement between the acquiring bank and the merchant.

An acquiring bank processed credit card transactions on behalf of its merchants and carried out the settlement process for them within the respective credit card systems. An acquiring bank also typically provided services to the merchant including deployment of credit card terminals at the point of sale, back-end customer service, risk management, and marketing activities.

---

[8]Acquiring banks are sometimes referred to as merchant's banks.

4.    The Merchant

The merchant sold goods or services to the cardholder.  With respect to a credit card purchase transaction, the merchant had no contract with the issuing bank.

5.    The Association (Visa or MasterCard)

Visa and MasterCard provided the infrastructure which enabled credit card transactions to take place.  They processed transactions between acquiring and issuing banks, allowing purchases to be authorized.  Further, the associations provided the infrastructure which allowed the parties to clear and settle millions of credit card transactions.  These processes are described below.

E.    A Typical Credit Card Purchase Transaction

Credit card purchase transactions typically included (1) an authorization process to enable the merchant to obtain the issuing bank's authorization for the cardholder's purchase and (2) a clearance process to transmit information regarding credit card transactions among the merchant, the acquiring bank, and the issuing bank as required under the association's operating rules.[9]  Credit card purchase transactions also included a separate flow of funds for settling accounts between issuing banks, acquiring banks, and merchants.  Visa and MasterCard each

---

[9]In 1998 and 1999 Capital One cardholders participated in 211,152,400 and 335,188,370 credit card transactions, respectively.

operated electronic network systems to process their respective card transactions, including approval, consolidation, and settlement. These systems are referred to as interchange systems. MasterCard's interchange system is known as BankNet, and Visa's is known as VisaNet.

A typical credit card purchase transaction is initiated by a cardholder who wants to make a purchase from a merchant. The cardholder presents the card to the merchant in payment for goods or services. The merchant swipes the cardholder's card in a credit card terminal, and data (including the purchase amount, cardholder identifying information, and merchant identity) flows from the merchant to the acquiring bank and then from the acquiring bank through the association to the issuing bank. Approval or denial of the transaction then flows from the issuing bank back through the association to the acquiring bank and then to the merchant. This flow of information typically takes place in a matter of seconds.

The process by which Visa and MasterCard credit card purchases were generally authorized is depicted in the chart below. In this hypothetical transaction:

(a) A cardholder purchases a lamp for a total price of $100 from a merchant using a Visa or MasterCard credit card issued by Capital One. The card is swiped through an electronic terminal

at the merchant's location.  The terminal is linked through the acquiring bank to the Visa or MasterCard network.  See step 1.

(b) The amount of the transaction and the cardholder information is routed from the merchant to the acquiring bank. See step 2.

(c)  The transaction information is routed from the acquiring bank through VisaNet or BankNet to Capital One.  See steps 3 and 4.

(d) Capital One either authorizes or declines the transaction, and a message is routed electronically through VisaNet or BankNet to the acquiring bank, and then to the merchant.  See steps 5, 6, and 7.  (The example assumes Capital One authorizes the purchase.)

(e) Once the merchant receives approval of the transaction, the cardholder provides the merchant with a signed transaction receipt, the merchant issues a receipt to the cardholder (sales receipt), and the cardholder departs with the lamp.  See steps 8, 9, and 10.

### Credit Card Purchase Transaction Authorization Process



By signing the transaction receipt, the cardholder promises to pay Capital One the total price shown thereon sometime in the future. The cardholder may pay more than the total price shown on the transaction receipt. For example, the cardholder may incur finance charges, late fees, or overlimit fees.

With respect to a credit card purchase transaction, the amount Capital One authorized to be charged (the total purchase price) was equal to the amount it expected to be paid by the cardholder. However, as discussed below, Capital One did not

authorize Visa or MasterCard to withdraw the total purchase price from its bank account as part of the net settlement process.

F.    The Clearing Process

For each credit card purchase transaction, the merchant furnished (either electronically or on paper) a detailed record to its acquiring bank that contained specific information about the transaction including the total price, the date of the purchase, the cardholder's account number, the brand and type of credit card used, the merchant's identifying information, the type of merchant (e.g., a grocery store or an airline), the type of transaction (e.g., a face-to-face purchase or an Internet transaction), and the issuing bank's authorization code, if obtained.  The merchant had to transmit this information to its acquiring bank to receive payment for the purchase.  In turn, the acquiring bank was required to accept and pay all properly presented transaction receipts from its merchant.

The acquiring bank consolidated and compiled information from all its merchants, calculated the applicable merchant discount (see section I, infra) for those merchants' transactions on the basis of the applicable merchant codes and other factors, and then transmitted that information to the applicable association for settlement.  The association then sorted and provided the relevant cardholder transaction information from all the acquiring banks, along with the association's interchange fee

computation, to each of its issuing banks for the respective issuing bank's cardholder transactions via a transaction record. MasterCard and Visa computed the interchange fees on a transaction-by-transaction basis for every credit card transaction submitted. The transaction records were compiled and reported daily to the issuing bank.

G.  Net Settlement

Capital One maintained a bank account with the Federal Reserve Bank of Richmond. In accordance with their respective rules, the associations were authorized to withdraw/debit and/or deposit/credit funds into Capital One's bank account to settle Capital One's credit card transactions each day. For credit card purchase transactions, the associations withdrew funds from Capital One's account and deposited funds in the corresponding acquiring bank's account. Both MasterCard and Visa were authorized to withdraw only the total price less the applicable interchange fee from Capital One's Federal Reserve Bank account.

The process through which credit card purchase transactions were settled during the years at issue is shown in the illustration below. This is an example of a single credit card purchase transaction, using a total price of $100, a hypothetical 2-percent interchange fee, and a hypothetical merchant discount of 2.5 percent. The example assumes that no other transactions occurred for the cardholder, the merchant, the acquiring bank, or

the issuing bank.  In settlement of this hypothetical transaction:

a.  The association withdraws $98 from the issuing bank's account, representing the $100 total price less the 2-percent interchange fee.

b.  The association deposits $98 into the acquiring bank's account, also representing the $100 total price less the 2-percent interchange fee.

c.  The acquiring bank deposits $97.50 into the merchant's bank account, representing the $100 total price less the 2.5-percent merchant discount.

### Settlement of $100 Credit Card Purchase Transaction



Although the chart above illustrates the settlement of a single discrete cardholder credit card purchase transaction, transactions were not typically settled individually. Rather, credit card transactions were aggregated and processed in large batches. The associations' settlement systems consolidated all batched transactions for a given period, usually daily, and settled accounts among the various members through a process known as direct net settlement. Direct net settlement resulted in the netting of all cash due to, from, and between the associations' respective members. Association members were required to net settle their transactions unless two members agreed otherwise.[10]

The association calculated the aggregate settlement position for each of its members. The association then withdrew funds from a member with a negative aggregate settlement position; i.e., a member who owed funds. With respect to credit card purchase transactions, the association withdrew funds from the issuing bank and deposited the net amount owed in the account of the acquiring bank. The amount deposited by the association with the acquiring bank in these circumstances would equal the total credit card purchases made at all of that acquiring bank's

---

[10]Members could, but rarely did, negotiate agreements among themselves to settle the transactions, in what were known as bilateral agreements. Capital One did not enter into any bilateral agreements.

merchants by all the issuing bank's cardholders less the total amount of interchange fees determined by the association with respect to those transactions.  Typically, the net settlement position determined by the association included any chargebacks[11] (reversed or canceled purchases initiated by issuing banks) processed that day, credits (initiated by merchants), and any other fees owed between issuing banks and acquiring banks.

To complete the process, the acquiring bank determined the amount of funds, net of the applicable merchant discount, due each of its merchants with respect to that merchant's aggregate settled credit card transactions.  However, this was not part of the associations' net settlement processes.

H.    Cardholder Payments

When a Capital One cardholder signed a transaction receipt, the cardholder promised to pay Capital One the full purchase price in accordance with the terms of the cardholder agreement. Capital One sent its cardholders monthly statements containing detailed purchase transaction entries reflecting the amounts owed by the cardholders.  The monthly statements also listed fees Capital One charged the cardholders, such as overlimit fees or

---

[11]When a chargeback was processed through MasterCard's interchange system, the interchange rate applied to the reversal of the transaction was not necessarily the same rate that applied when the original transaction was settled.

late fees.  The monthly statements did not list the amount of interchange applicable to the transactions.

Under the terms of the cardholder agreement, a cardholder was obligated to pay Capital One at least a certain amount (minimum payment) by the due date specified in the statement. The minimum payment was typically 2 or 3 percent of the cardholder's outstanding balance with at least $10 or $15 due. The cardholder agreement did not specify a date by which the charge would have to be paid in full.

The cardholder agreement provided for a grace period with respect to purchase transactions in which finance charges on new purchases could be avoided if the total outstanding balance was paid in full before the due date specified on the statement.  The cardholder agreement explained:

> You may avoid finance charge[s] on new purchases and on other new charges by paying the total new balance in full prior to the date payment is due (this is the grace period on new purchases).  If you do not pay the entire new balance from the previous statement, finance charges will accrue on the entire previous new balance from the first date of the new billing period.  Finance charges, when applicable, will be assessed as follows:
>
> - Transactions made during the current billing period from transaction date.
> - Undated transactions and transactions made with convenience checks:  from the date the transaction is processed to your account.
> - Transactions made prior to the current billing period:  from the first calendar day of the current billing period.

Capital One provided its cardholders with a grace period that approximated 30 days. Because Capital One's billing cycles approximated 30 days and the grace period approximated 30 days, a cardholder could have up to 60 days between the date a credit card purchase was made and the date payment was due.

Cardholders who routinely pay their balance in full every month are known in the credit card industry as transactors. Cardholders who routinely carry a balance on their card are known as revolvers. Of Capital One's total credit card purchase volume (in dollars), approximately 50 percent was attributable to transactors and 50 percent to revolvers.

I.  Merchant Discount in Detail

The difference between the total price of the goods or services sold to cardholders and the amount remitted to the merchant by the acquiring bank is known as the merchant discount or gross merchant discount. The merchant discount was typically a fixed percentage of the total price of the goods or services sold and compensated acquiring banks for the services they provided the merchant. Unlike interchange, the merchant discount was not determined by the association. Rather, merchant discounts were negotiated between acquiring banks and their respective merchants. The difference between the amount the acquiring bank receives from the issuing bank and the amount the acquiring bank sends to the merchant is generally known as the

net merchant discount; i.e., the difference between the gross merchant discount and the interchange fee.

## J.   Interchange in Detail

MasterCard and Visa set the interchange rates on their respective systems but did not publish them during the years at issue.  At some point later, they began publishing their interchange rates.  Both MasterCard and Visa used the interchange system to maximize system participation through increased issuance of cards and increased acceptance by merchants.  If interchange rates were set too high, acquiring banks would raise the merchant discount, and merchants would be less likely to accept MasterCard or Visa cards.  If interchange rates were set too low, issuing banks were less likely to issue MasterCard or Visa cards because they might not have been able to cover their costs and make a sufficient profit.

### 1.   Factors Influencing Interchange Rates

To balance the interests of the various parties to a credit card purchase transaction and to maximize system participation, both Visa and MasterCard have implemented a variety of interchange rates.  The rates were based on a number of factors including:  (1) The method of the purchase (e.g., in person or on line); (2) the type of merchant; (3) the geographical area of the merchant (e.g., domestic or international); (4) the type of cardholder (e.g., individual/personal or corporate/business); (5)

in some instances the size of the transaction (e.g., a "large ticket" purchase over a certain threshold amount); and (6) the type of purchase (e.g., corporate travel and entertainment expense).

The associations also set lower interchange rates to better compete with other payment systems or methods.  For example, supermarkets typically operated on low gross profit margins and were reluctant to accept Visa and MasterCard cards because of the merchant discount.  Both Visa and MasterCard implemented lower interchange rates for supermarkets, resulting in lower merchant discounts, thereby incentivizing card acceptance.  The associations also implemented lower interchange rates to better penetrate other markets including automated fuel dispensers.

MasterCard's interchange rates included the following categories:

| Program Name | 1997-1998 Rates | 1998-1999 Rates | 1999-2000 Rates |
|---|---|---|---|
| Consumer Standard | 2.15% + $0.10 | 2.35% + $0.10 | 2.65% + $0.10 |
| Travel Industries | 1.35% + $0.10 | 1.43% + $0.10 | 1.58% + $0.10 |
| Petroleum Terminal | 1.35% + $0.05 | 1.40% + $0.05 | 1.50% + $0.05 |
| Supermarket | 1.10% | 1.15% | 1.15% |
| Corporate Standard | 2.25% | 2.52% + 0.10 | 2.65% + 0.10 |

Visa's interchange rates included the following categories:

| Program Name | 9/27/97–3/27/98 Rates | 3/28/98–4/9/99 Rates |
|---|---|---|
| Standard Commercial (Other than Certain Travel-Related Charges) | 2.00% + $0.11 | 2.09% + $0.10 |
| CPS/Retail[1] Commercial (Other than Certain Travel-Related Charges) | 1.25% | 1.31% |
| CPS/Hotel and Car Rental | 1.93% + $0.06 | 2.02% + $0.10 |
| Supermarket Incentive Program, Non-Commercial | 1.10% | 1.15% |

[1]CPS refers to "custom payment service", Visa's term for card transactions that are processed a certain way.

## 2. Capital One's Costs and Interchange

The costs of issuing banks, such as Capital One, were one factor associations considered when they set interchange rates. Both Visa and MasterCard studied issuing banks' costs. MasterCard hired Edgar, Dunn & Co. (Edgar Dunn), a consulting firm, to study issuing banks' costs as part of MasterCard's process for setting interchange rates. The costs studied included the grace period cost of funds for transactors, risk costs for credit card transactions generally (credit and fraud risks), and processing costs for credit card transactions. These studies did not address the cost of funds for revolvers; that is, cardholders who carry a balance on their card and therefore pay monthly finance charges. Edgar Dunn's composite issuing bank cost figures were as follows:

| Year | Issuing Banks' Costs[1] |
|------|------------------------|
| 1997 | 2.52 percent + $0.10 per transaction |
| 1998 | 2.92 percent + $0.10 per transaction |
| 1999 | 2.97 percent + $0.10 per transaction |

[1]Edgar Dunn broke the total cost down into components.  The issuing bank's cost of lending money, i.e., the financial carrying costs during the grace period, were .20 percent, .22 percent, and .20 percent of the total purchase price during 1997, 1998, and 1999, respectively.  For 1997, 1998, and 1999, 2.32 percent, 2.70 percent, and 2.77 percent of the total purchase price represented the total risk costs.  Edgar Dunn calculated the issuing bank's processing costs to be 10 cents per transaction.

For 1997 Visa estimated that the average processing cost per transaction was 8.4 cents, with the actual costs ranging between 4.8 cents and 11.4 cents.  For 2000 the average cost was 6.6 cents per transaction, with the actual costs ranging between 3.8 cents and 9.7 cents per transaction.  For 1998 and 1999 Capital One's cost of processing a credit card transaction was likely between 4.6 cents and 8.2 cents per transaction.

3.   Debit Cards and Interchange

During the years at issue Capital One did not issue signature debit cards.[12]  A signature debit card is linked to the

_____

[12]Capital One also did not issue PIN debit cards which are linked to a cardholder's checking account issued by the cardholder's bank.  Unlike signature debit cards, the systems are not operated by Visa or MasterCard; these systems are operated by a number of other systems, including Plus and Cirrus.  Rather than signing her name, the cardholder enters her PIN.  A PIN debit transaction is processed through an electronic funds transfer network and effects an immediate withdrawal from the

(continued...)

cardholder's deposit account, from which the purchase price of the goods or services purchased is withdrawn, as opposed to a credit card which evidences a line of credit. However, other issuing banks which were members of the associations did offer debit cards. Both Visa and MasterCard set interchange rates for their debit cards. MasterCard's interchange rates for credit card transactions were identical to those for debit card transactions for each of MasterCard's consumer interchange programs. In a number of instances, Visa's debit card interchange rates were equal to the interchange rates for its credit card transactions. Data published by the Federal Reserve System in a report to Congress shows that until 2002, the interchange rate on signature debit card transactions was only slightly lower than the interchange rate on credit card transactions.

4. Capital One's Accounting Treatment of Credit Card Purchases and Associated Interchange Income

Capital One kept track of all its cardholders' charges in what is known as its cardholder account system (CAS). The CAS reflected the amount of each purchase made with a Capital One card which was the same as the total purchase price of whatever the cardholder purchased in that particular transaction. The CAS

_____

[12](...continued) cardholder's account to satisfy the purchase amount. There can be interchange and a merchant discount in these transactions as well, either a percentage or a flat fee.

did not reflect any detail with respect to the amount of interchange received. Capital One maintained so called "310 reports", which were monthly summaries aggregating transaction data and financial accruals. The 310 reports did not include any information about interchange either on an individual cardholder basis or on an aggregate basis.

For financial accounting purposes, Capital One accounted for credit card purchase amounts and interchange fees through separate systems. Capital One used daily summary reports from Visa and MasterCard for purposes of booking interchange income. Using the example of a $100 purchase transaction with a $2 interchange fee, Capital One would enter the purchase amount as "credit card outstanding" (an account receivable). The $2 interchange fee would be credited as "interchange income". For financial accounting purposes, Capital One reported interchange income as "noninterest income".

Before 1998 Capital One recognized income from late fees and overlimit fees for both financial accounting purposes and Federal income tax purposes at the time the fees were charged to the cardholder. Before 1998 Capital One recognized interchange income for both financial accounting and Federal income tax purposes at the time its cardholders' transactions were net settled under the Visa and MasterCard rules. For financial

accounting and regulatory reporting purposes,[13] Capital One differentiated between interest and noninterest income according to whether the particular income was attributable to an activity of the cardholder.  For example, Capital One treated cash advance fees as noninterest income because a cardholder would have withdrawn cash at an ATM or a bank.[14]  Similarly Capital One treated interchange as noninterest income for financial accounting and regulatory reporting purposes because it is triggered by the cardholder's purchase.

On their Federal income tax returns for 1998 and 1999, petitioners recognized Capital One's income from overlimit fees, cash advance fees, and interchange fees as creating or increasing the amount of OID on Capital One's pool of credit card loans, thereby deferring the recognition of income and reducing their Federal income tax liabilities.  Respondent challenges petitioners' treatment of Capital One's interchange income as creating or increasing OID under section 1272(a)(6)(C)(iii).

---

[13]The regulatory reports were filed with the Office of the Comptroller of Currency.

[14]For Federal income tax purposes Capital One treated cash advance fees as creating or increasing OID before 1998 as well as after 1998.  Respondent has conceded this treatment is proper.

OPINION

A.    An Overview of the Issue and the Law

Under section 1272(a)(6)(C)(iii) taxpayers that issue credit cards and lend money to their cardholders are required to treat certain credit card receivables as creating or increasing OID on the pool of credit card loans to which the receivables relate. See Capital One Fin. Corp. v. Commissioner, 130 T.C. 147, 150 (2008).  The issue is whether Capital One's interchange income is properly recognized over time under section 1272(a)(6)(C)(iii), or whether interchange income is properly recognized at the time the cardholders' charge is settled under the respective associations' systems.  In our prior Opinion, Capital One Fin. Corp. v. Commissioner, supra at 150-151, we described in general terms the OID rules and section 1272(a)(6)(C)(iii):

> The holder of a debt instrument with OID generally accrues and includes in gross income, as interest, the OID over the life of the obligation, even though the interest may not be received until the maturity of the instrument.  Sec. 1272(a)(1).  The amount of OID with respect to a debt instrument is the excess of the stated redemption price at maturity (SRPM) over the issue price of the debt instrument.  Sec. 1273(a)(1).  The SRPM includes all amounts payable at maturity.  Sec. 1273(a)(2).  In order to compute the amount of OID and the portion of OID allocable to a period, the SRPM and the time of maturity must be known.  This presents a problem for debts such as credit card loans and real estate mortgages that may be satisfied over a very short or a very long period, thus making the time of maturity an unknown at the inception of the debt.

For this reason, special rules were created for determining the amount of OID allocated to a period for certain instruments that may be subject to prepayment. In the case of (1) any regular interest in a real estate mortgage investment conduit (REMIC), (2) qualified mortgages held by a REMIC, or (3) any other debt instrument if payments under the instrument may be accelerated by reason of prepayments of other obligations securing the instrument, the daily portions of the OID on such debt instruments are determined by taking into account an assumption regarding the prepayment of principal for such instruments. Sec. 1272(a)(6)(C)(i) and (ii).

Section 1272(a)(6)(C)(iii) applies this special OID rule to any pool of debt instruments the payments on which may be accelerated by reason of prepayments. It is clear that section 1272(a)(6)(C)(iii) was intended to apply to credit card loans and the related receivables. See H. Conf. Rept. 105-220, at 522 (1997), 1997-4 C.B. (Vol. 2) 1457, 1992. What was unclear at the time of enactment and is still not fully resolved is which credit card receivables increase OID under section 1272(a)(6)(C) and which do not.
[Fn. ref. omitted.]

Respondent has conceded that as a general proposition cash advance fees, overlimit fees, and late fees may be treated as creating or increasing OID on the pool of loans to which such income relates. See id. at 153-154.

B.   The SRPM of a Credit Card Loan

The parties agree that the SRPM of a credit card loan is the sum of all payments provided by the debt instrument other than finance charges. See sec. 1.1273-1(b), Income Tax Regs. In the example of a $100 purchase of goods or services from the merchant, the SRPM is equal to $100 because the cardholder, if

she lived up to her agreement, would have paid at least $100 to Capital One.  The starting point for the SRPM is the total price of the goods or services the cardholder purchases.  The SRPM may increase if the cardholder incurs a late fee or an overlimit fee, but the SRPM is not increased by any finance charges, i.e., qualified stated interest,[15] incurred.

C.   The Issue Price of a Credit Card Loan

The parties dispute the calculation of the issue price of a credit card loan.  Section 1273(b)(2) defines the issue price of an instrument issued for money and not publicly offered as "the price paid by the first buyer of such debt instrument."  The regulations expand on this definition:

> if an issue consists of a single debt instrument that
> is issued for money, the issue price of the debt
> instrument is the amount paid for the debt
> instrument.
> For example, in the case of a debt instrument
> evidencing a loan to a natural person, the issue price
> of the instrument is the amount loaned. * * *

Sec. 1.1273-2(a)(1), Income Tax Regs. If X Bank lends $1,000 to A, an individual, the issue price of the loan would be $1,000.

However, a credit card loan is part of a multiparty transaction where the funds lent are sent to the merchant via the

---

[15]Qualified stated interest is defined as the "stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer), or that will be constructively received under section 451, at least annually at a single fixed rate".  Sec. 1.1273-1(c)(1)(i), Income Tax Regs.

acquiring bank.  The cardholder never receives the funds, and the funds received by the merchant are always less than the amount the cardholder must repay.  The issue price of a credit card loan is the price paid for the debt instrument.[16]  Sec. 1273(b)(2).

Petitioners argue that Capital One acquired the loan at a discount from the price at which the cardholder purchased goods or services from the merchant, with the discount being the amount of interchange, i.e., $2 for a $100 purchase, where Capital One actually advanced $98 to the acquiring bank.  Respondent argues that Capital One cannot have acquired the loan at a discount because the acquiring bank, and not the cardholder, paid interchange to Capital One during the net settlement process.  Further, respondent argues that interchange was a fee for services rendered by the issuing bank, not economically equivalent to interest, and therefore not OID.

   1.  <u>Whether Interchange Is a Fee for a Service (and If So, What Service) or Economically Equivalent to Interest</u>

---

[16]If the issue price was the "amount loaned", see sec. 1.1273-2(a)(1), Income Tax Regs., the parties would still dispute the amount loaned to the cardholder.  Using the $100 purchase example, the amount loaned could be $98 or $100, depending on whether interchange is viewed as a fee for a service as respondent contends or as a discount as petitioners contend.  In this way, determining the issue price by determining the "amount loaned" would require the same analysis as determining the "price paid" for the credit card loan, and our conclusion would be the same.

Respondent argues that interchange is a fee for a service, and that Capital One acquired a credit card loan for an amount equal to the full price at which the cardholder purchased goods or services from the merchant, but that Capital One simultaneously received a payment from the acquiring bank equal to the interchange amount. Thus in respondent's view the issue price paid by Capital One to acquire the loan would be the total purchase price of the goods or services which would in turn equal the SRPM resulting in no OID.

In determining whether interchange is a service fee or economically equivalent to interest, we draw on other areas of the tax law where distinctions between fees and interest have been made. Courts, including this Court, have held that fees earned by a lender relating to the lending of money are properly treated as interest unless the fee is for a specific service. Although courts look to all the facts and circumstances to determine whether an item of income is a service fee or interest, the primary inquiry is whether the charge compensates the lender for specifically stated services it provided to and for the benefit of the borrower beyond the lending of money. In W. Credit Co. v. Commissioner, 38 T.C. 979, 980 (1962), affd. 325 F.2d 1022 (9th Cir. 1963), a lender in the business of making small loans to individuals levied a "contract charge" and a "carrying charge" on each loan. The contract charge was $10 if

the loan was $100 or less, and was the greater of $15 or 3 percent of the loan if the loan exceeded $100.  Id.  It was not related to the duration of the loan and was not allocated to specific services.  Id. at 987.  The carrying charge was 1 percent per month of the principal sum of the loan if the loan was for $100 or more.  Id. at 980.  The lender also charged fees for filing and recording chattel mortgages and life insurance premiums on the borrower's life.  Id.  The issue we faced was whether the contract charge constituted interest.  We held:

> We do not think the mere fact that the contract
> designates certain uses to which the funds will be put
> makes the charge any less a fee paid by the borrower
> for use of the lender's money, unless it is shown that
> the charge was actually used for such purposes and the
> charge is justifiably a charge to the borrower separate
> from interest.  Unless such can be shown, we believe
> the service charges made by small loan companies must
> be considered interest because basically the nature of
> the small loan company business is to make a profit in
> the form of interest on money loaned and the borrower
> is interested only in obtaining the loan and pays
> whatever is required of him to get the use of the
> lender's money. * * *

Id. at 987-988; see Noteman v. Welch, 108 F.2d 206, 213 (1st Cir. 1939) (3-percent fee charged to all borrowers was interest because the only consideration the borrower received was the use of the money lent); Seaboard Loan & Sav. Association v. Commissioner, 45 B.T.A. 510, 516 (1941) (service fees charged by a loan company ostensibly for investigating, closing, and servicing loans were interest because "all the services charged for were for the benefit of the lender and not for the benefit of

the borrower, and the only consideration received for the amounts paid by the borrower was the money loaned").

On direct examination by respondent, MasterCard's Steven Jonas, the senior business leader for financial analysis with MasterCard Worldwide,[17] was asked whether interchange compensated an issuing bank for a specific service.  He testified:

> I don't think directly.  I think the issuers are providing a service to the cardholders, enabling them to go out and transact.  Not directly - I mean, to some extent, the issuer does provide value to a merchant because they now have enabled the cardholder to go out and make purchases, and the acquirer makes money by processing transactions.  And the merchant makes money by selling goods and services.  But I think I view the transaction, the service being provided is to the cardholder who is borrowing money and, therefore, going out and making purchases.

Similarly, when asked about his statement that "Interchange rates are not a fee for any specific service provided by issuing banks", William Sheedy, the president of Visa, Inc.,[18] explained:

> We're not looking at any particular service.  We're considering the product in general, the premium credit product.  We want the issuers to invest in that product, to choose to do business with Visa, as compared to our competitors.  And we also want the product and rate structure to be configured in a way that the issuers will prioritize that within their business and market it and promote it and put resources against it, because our experience is when that happens, it grows our business.

---

[17]Mr. Jonas was responsible for, among other things, the development and implementation of MasterCard's interchange rate programs in the United States.

[18]Mr. Sheedy had previously been employed as the executive vice president of interchange strategy for Visa, U.S.A., Inc.

Respondent's expert witness, Dr. Richard Schmalensee,[19] testified that the service provided "is putting customers on the streets with cards eager to use them to buy from merchants." Credit cards evidence a line of credit on which cardholders can draw, and providing credit cards that can be used to make purchases is the lending of money. Certainly the lending of money benefits cardholders, merchants, and acquiring banks, but the receipt of a benefit does not mean that those parties have been provided a service other than the lending of money to the cardholder.

In arguing that interchange is a fee for a service, respondent focuses on the purpose of interchange, which is to balance the two sides of the credit card business to encourage the overall growth of the respective systems. If interchange rates are set too high, acquiring bank and merchant participation are disincentivized. If interchange is set too low, card issuing is disincentivized. Respondent makes much of MasterCard's and Visa's desire to use optimal interchange rates to increase their business. However, using interchange to balance the two sides of the credit card business is entirely consistent with petitioners'

---

[19]Dr. Schmalensee is the Howard W. Johnson Professor of Management and Economics at the Massachusetts Institute of Technology and the John C. Head III Dean Emeritus of the Massachusetts Institute of Technology Sloan School of Management. He is the coauthor of two editions of Paying with Plastic (1999 & 2005), a text on the economics of payment card systems.

position that interchange compensates issuing banks for the cost of lending money.

We agree that setting interchange rates is a balancing act, but we ask: what are the associations balancing? MasterCard and Visa balance the issuing banks' and the acquiring banks' needs to profit on credit card transactions. Profit is the excess of revenues over costs. When lending money to its cardholders, Capital One incurs the cost of processing transactions, financial carrying costs, and the risk costs associated with credit card transactions, for example, the risk that fraud was committed (fraud risk) and the risk that the cardholder will be unable to repay the loan (credit risk). In short, interchange compensates banks for the costs of lending money.

Respondent argues that interchange has little to do with the costs of lending money, specifically the time value of Capital One's money lent to the cardholders. In respondent's view if interchange is not akin to interest, it must be a fee for a service. Respondent's argument presupposes that for interchange to be treated as creating or increasing OID, it must be economically equivalent to interest.

OID "serves the same function as stated interest * * *; it is simply 'compensation for the use or forbearance of money.'" United States v. Midland-Ross Corp., 381 U.S. 54, 57 (1965) (citations omitted). Under section 1273(a)(2) an amount payable

at the maturity of a debt instrument need not bear all the characteristics of interest to be included in the SRPM, and thus increase the amount of OID on the instrument. Section 1273(a)(2) defines the SRPM as:

> the amount fixed by the last modification of the purchase agreement and includes interest <u>and other amounts payable at that time</u> (other than any interest based on a fixed rate, and payable unconditionally at fixed periodic intervals of 1 year or less during the entire term of the debt instrument). [Emphasis added.]

If Capital One acquired the loan for less than the SRPM, there was OID on the transaction regardless of whether amounts included in the SRPM and not included in the issue price were equivalent to interest. Nevertheless, interchange resembles interest in many ways.

For many transactors interchange would be the only revenue Capital One receives.[20] The length of Capital One's loan to a transactor may be as little as a day or two (if the cardholder pays Capital One immediately upon making a charge) or as long as 60 days (if the cardholder makes a charge on the first day of the billing cycle and pays the statement balance on the last day of the grace period). Whether for 1 day or 60, Capital One has forgone the use of those funds, and payments for such use resemble interest. If interchange is not payment for the use of

---

[20]The exception would be a cardholder who paid an annual fee for the privilege of having a Capital One card or a cardholder who incurred another fee such as an overlimit fee.

the funds Capital One has lent, then Capital One would not have received compensation for the use of approximately half the funds lent to its cardholders. With respect to transactors, interchange compensates Capital One for the expenses and costs associated with lending money to cardholders, including financial carrying costs and credit and fraud risks.

MasterCard's rules explain the relationship between interchange fees and issuing banks' costs of lending:

> Purpose of Fees. The interchange fee * * * [is] designed to compensate a member for particular expenses that it incurs as the result of interchange transactions. For sale transactions, various elements of expense make up the interchange fee, including costs of processing, costs of money, and increased risk due to the use of MasterCard cards in interchange transactions.

Respondent's expert witness, Dr. Schmalensee, testified that "[interchange is] a revenue stream that serves to compensate banks for all the costs involved in credit card and other payment card programs."

In determining interchange rates, Visa and MasterCard studied and considered issuing banks' costs of lending. The Edgar Dunn studies break down an issuing bank's costs into three of the largest categories: Risk costs, financial carrying costs, and processing costs. Risk costs include credit and fraud risks. The financial carrying costs are the "imputed interest cost to the issuing member of carrying the interchange transactions from

the time of account posting to the receipt of funds or accruing of cardholder interest by the issuing member."

Petitioners' expert witness, Dr. Peter Tufano,[21] explained that when interchange is viewed as an "economic" interest rate, the average annualized rate is "similar to those of interest rates for unsecured consumer loans during 1998 and 1999." The speed at which the cardholder loan is paid off can dramatically affect this rate, returning seemingly exorbitant interest rates of over 100 percent in situations where the cardholder pays the loan off within a few days. However, very high interest rates are not uncommon in numerous forms of unsecured consumer lending, such as so-called payday loans where the effective interest rate can be between 390 and 500 percent depending on when the loan is repaid. That the effective interest rate varies depending on when the cardholder pays off the loan does not affect the function of interchange, which is to compensate issuing banks for the cost of lending money.

Respondent also invites our attention to signature debit cards, which involve little or no lending, just a "float" of at

---

[21]Dr. Tufano is the Sylvan C. Coleman Professor of Financial Management and Senior Associate Dean at Harvard Business School. He has taught courses in finance, capital markets, financial engineering, and consumer finance in the MBA and Executive Programs at Harvard Business School.

most 1 or 2 days.[22]  Visa's and MasterCard's interchange rates for signature debit cards were often identical to the interchange rates for credit cards during the years at issue.  Until 2002 interchange rates on debit card transactions were only slightly lower than the rates on credit card transactions.  Respondent concludes that interchange is not equivalent to interest because similar interchange rates were used for debit cards, which involve little to no lending.  Just as the associations considered several factors in setting credit card interchange rates, we assume they considered similar factors in setting debit card interchange rates.  The similarity between the rates during the years at issue does not negate our conclusion that interchange compensates Capital One for its costs of lending money.

Revolvers, as opposed to transactors, pay finance charges which are stated separately on the cardholder's monthly statements.  Stated finance charges compensate Capital One for the use of the money lent, and revolvers do not have the benefit of a grace period during which they receive the use of funds interest free.  Dr. Tufano testified that, with respect to revolvers, interchange is viewed as additional compensation for the use of the money lent.  Dr. Tufano analyzed the effective

---

[22]Capital One did not issue signature debit cards during the years at issue.  See paragraph J.3., supra.

interests rate of interchange fees on a revolving account and determined that, on average, interchange raises the annual percentage rate by about 1.7 percent, which was still comparable with other types of consumer loans.

Credit and fraud risks are also costs associated with lending money. Interest, including OID, compensates lenders for the time value of their money, the risk that the borrower may not repay principal, and the expenses of pursuing delinquent debtors. Noteman v. Welch, 108 F.2d at 212-213; Bank of Am. v. United States, 230 Ct. Cl. 679, 680 F.2d 142, 148 (1982) ("interest typically covers credit risk, credit administration, and cost of funds.").

Interchange resembles interest in other ways as well. In almost all instances, it is expressed as a percentage of the amount lent, usually with an additional nominal fee.[23] Thus, as the amount of the loan increases, the amount of interchange increases, just as the amount of interest increases as the amount of the loan increases. As we said in Fort Howard Corp. & Subs. v. Commissioner, 103 T.C. 345, 374 (1994), modified on another issue 107 T.C. 187 (1996): "Crucial in establishing whether a particular payment constitutes interest is whether the payment

---

[23]The nominal fee portion of interchange transactions is usually between $.05 and $.10. In 1999 the average interchange fee for a Visa credit card transaction was $1.62. Therefore, the nominal fee accounted for between 3 and 6 percent of the total fee.

bears some relationship to the amount borrowed".  See also <u>Sharp v. Commissioner</u>, 75 T.C. 21, 32 (1980), affd. 689 F.2d 87 (6th Cir. 1982); <u>Lay v. Commissioner</u>, 69 T.C. 421, 438 (1977).

Respondent argues that interchange rates were not driven by movements in market interest rates.  For example, between 1999 and 2004 the prime rate fell from 8 percent to 4 percent, yet average interchange rates rose slightly, from 1.62 percent to 1.71 percent.  Petitioners' expert witness, David Boucher, counters that certain interest rates are "sticky" in that they do not often change, and that sticky interest rates are not uncommon in consumer lending.  For example, the interest rate for payday loans has not changed in at least 10 years.  Furthermore, interchange rates take into account various other factors such as credit and fraud risk, processing costs, and Visa's and MasterCard's efforts to maximize their business by competing with other payment systems and balancing the competing sides of the credit card business.

That interchange did not cover all of Capital One's costs of lending does not make it less "interestlike".  Interchange rates were not set by Capital One but were set by VISA and MasterCard to increase their business, compete with other payment card systems, and penetrate new markets.  To continue issuing Visa and MasterCard credit cards Capital One was required to accept those rates.  Whether interchange covered all of Capital One's costs,

or covered just a small fraction of them for certain types of credit card transactions is not dispositive of our determination of whether interchange is a fee for a service or economically equivalent to interest.[24]

We conclude that interchange is not a fee for any service other than lending money to cardholders, income from which is generally treated as interest.  Petitioners have shown that interchange fees are a form of interest compensating Capital One for the costs of lending money.

2.  <u>Whether the Cardholder, the Merchant, or the Acquiring Bank Pays Interchange</u>

The parties present two competing views of a credit card purchase transaction.  Petitioners argue that Capital One acquired the credit card receivable, i.e., the transaction receipt, from the acquiring bank.  This would suggest that Capital One acquired the debt instrument at a discount. Returning to the $100 purchase with 2-percent interchange example, Capital One authorized the cardholder to make a $100 purchase, but Capital One did not authorize MasterCard or Visa to withdraw $100 from its account.  It authorized only a $98 withdrawal, the purchase price less interchange.  Respondent

---

[24]Petitioners argue that a credit card purchase transaction is like a factoring transaction.  However, the record is devoid of any evidence that Capital One engaged in factoring; that is to say, Capital One did not purchase debts owed to another, stepping into the lender's shoes, but is itself the lender ab initio.

contends that Capital One lends the cardholder $100 for the cardholder's promise to pay $100, and that the acquiring bank paid Capital One $2.  In this scenario, $2 would be a fee for services and not OID.

Neither the Code nor the regulations define the term "paid", but courts have generally defined it as the paying out of cash or its equivalent.  See United States v. Clardy, 612 F.2d 1139, 1151 (9th Cir. 1980) ("The classic definition of 'paid' * * * [in the context of interest deductions under section 163(a)] is 'a payment (of) cash or its equivalent'.").  In a credit card transaction cash flows as an initial matter from the issuing bank, not to the issuing bank; therefore petitioners argue that the cashflow from the issuing bank to the acquiring bank was the amount paid for the debt instrument.

But the debate about who really bears the cost of interchange is largely academic, and we need not, and do not, base our decision on its outcome.  Whether merchants, acquiring banks, or cardholders ultimately pay interchange is not determinative of the tax treatment of interchange.  If we accept respondent's argument that acquiring banks pay interchange to issuing banks, we would still conclude that interchange is properly treated as creating or increasing OID on the pool of loans to which it relates.

Section 1.1273-2(g)(4), Income Tax Regs., provides:

> If, as part of a lending transaction, a party other
> than the borrower (the third party) makes a payment to
> the lender, the payment is treated in appropriate
> circumstances as made from the third party to the
> borrower followed by a payment in the same amount from
> the borrower to the lender and governed by the
> provisions of paragraph (g)(2) of this section. * * *

Section 1.1273-2(g)(2)(i), Income Tax Regs., provides:

> a payment from the borrower to the lender (other than a
> payment for property or for services provided by the
> lender, such as commitment fees or loan processing
> costs) reduces the issue price of the debt instrument
> evidencing the loan. * * *

Respondent argues that interchange is not a part of a
lending transaction because the purpose of interchange is to
balance the competing interests of the issuing and acquiring
banks.  As discussed earlier interchange compensates issuing
banks for the costs of lending money, and but for the lending of
money, Capital One would not earn any interchange.  In short,
interchange is part of a lending transaction.[25]

Under respondent's theory, a third party, the acquiring
bank, pays interchange to the lender, Capital One.  As discussed
above, that payment is not for property or services provided by
the lender other than the service of lending of money to the

---

[25]At trial, Dr. Schmalensee, respondent's expert, was asked:
"you would agree with me, wouldn't you, Dr. Schmalensee, that
interchange in a Visa or MasterCard credit card transaction is
part of a lending transaction, isn't that correct?"  Dr.
Schmalensee replied:  "It's part of a lending transaction."

cardholder.[26]  Therefore, under section 1.1273-2(g)(4), Income Tax Regs., that payment may, in appropriate circumstances, be treated as a payment from the cardholder to the lender.  The question is: what are appropriate circumstances?

The regulations provide an example of a situation in which a payment from a third party to a lender results in OID.  Section 1.1273-2(g)(5), Example (3), Income Tax Regs., describes a situation where a real property seller pays the buyer's "points" to facilitate the buyer's loan to purchase property:

> (i) Facts.  A sells real property to B for $500,000 in a transaction that is not a potentially abusive situation (within the meaning of §1.1274-3).  B makes a cash down payment of $100,000 and borrows $400,000 of the purchase price from a lender,     L, repayable in annual installments over a term of 15 years calling for interest at a rate of 9 percent, compounded annually.  As part of the transaction, A makes a payment of $8,000 to L to facilitate the loan to B.
>
> (ii) * * * Under the provisions of paragraphs (g)(2)(i) and (g)(4) of this section, B is treated as having made an $8,000 payment directly to L and a payment of only $492,000 to A for the property.  * * * The payment to L reduces the issue price of B's debt instrument to $392,000, resulting in $8,000 of OID ($400,000 - $392,000).  * * *

--------

[26]Respondent argues that in exchange for paying interchange merchants receive substantial services from Capital One including protection from fraud and credit risk, the reduced costs of handling cash, reduced employee costs, increased sales, and access to new markets.  Merchants certainly receive benefits from consumers' use of credit cards, but Capital One does not provide merchants a service simply because merchants receive a benefit.  As discussed above, the service provided is the lending of money, which benefits all the parties in a credit card purchase transaction.

A credit card loan is not a "potentially abusive situation" under section 1.1274-3(a), Income Tax Regs. In this example the seller pays the purchaser's points in order to facilitate the loan. Mr. Sheedy, Mr. Jonas, Dr. Schmalensee, and Dr. Tufano all testified that interchange encourages issuing banks to lend money to cardholders so that the cardholders can make purchases.

Under these circumstances, we conclude that even if respondent is correct that the acquiring bank pays interchange to the issuing bank, that amount is considered a payment between a third party and a lender which reduces the issue price of the debt instrument under section 1.1273-2(g)(2)(i) and (4), Income Tax Regs.

D. Conclusion With Respect to the Interchange Issue

The SRPM of a credit card loan is the purchase price of the goods and services financed by the loan. The issue price of a credit card loan is the amount the issuing bank pays for the loan. Because Capital One authorized MasterCard and Visa to withdraw the purchase price less the applicable interchange amount for every credit card purchase transaction, Capital One paid an amount less than the SRPM for the credit card loan. The difference between the SRPM and the issue price, the interchange on the transaction, is therefore properly treated as OID.

Issue 2:  The Calculation of OID Under Section 1272(a)(6)(C)

FINDINGS OF FACT

A.  Accounting Methods

On August 5, 1997, Congress enacted the Taxpayer Relief Act of 1997 (TRA), Pub. L. 105-34, sec. 1004, 111 Stat. 911, which added section 1272(a)(6)(C)(iii) to the Code.  On September 15, 1999, COB submitted Form 3115, Application for Change in Accounting Method, by attaching it to petitioners' consolidated Federal income tax return for 1998.  Capital One Fin. Corp. v. Commissioner, 130 T.C. at 149.  COB stated on the Form 3115:

> Capital One Bank (COB), a domestic corporation, requests permission under Section 12.02 of Rev. Proc. 98-60 to change its method of accounting for interest and original issue discount that are subject to the provisions of Section 1004 of the Tax Relief Act of 1997.

FSB did not submit Form 3115 to respondent requesting permission to change its accounting method to conform to the requirements of section 1272(a)(6)(C)(iii) and TRA section 1004.

Nevertheless, FSB as well as COB treated overlimit fees and interchange as creating or increasing OID under section 1272(a)(6)(C)(iii) on petitioners' consolidated 1998 and 1999 returns.  To calculate the proper amount of OID includable on their returns, COB and FSB used a complex formula developed by the accounting firm KPMG (KPMG model).  After discussing section 1272(a)(6) and the principles behind calculating OID under that

section for a pool of loans, we will discuss the KPMG model in detail.

B.  Income and OID Accruals of Overlimit Fees and Interchange

The following chart shows the fees COB[27] earned for book purposes (when the fee was charged to the cardholder in the case of overlimit fees and when the cardholder's purchase was settled by the associations in the case of fees for interchange), the amount of COB's related OID included on petitioners' consolidated income tax return, the difference between them, and the amount of accrued but unrecognized OID carrying over to the following year.

Overlimit Fees

| Taxable Year | Overlimit Fee Income for book purposes | Income Recognized per KPMG Model | Difference: Book v. KPMG Model | Unamortized OID Bal. at End of Year |
|---|---|---|---|---|
| 1995 | $62,492,312 | $21,823,631 | $40,668,680 | $40,668,681 |
| 1996 | 147,929,903 | 71,177,420 | 76,752,482 | 117,421,163 |
| 1997 | 288,906,382 | 192,694,592 | 96,211,790 | 213,632,953 |
| 1998 | 436,215,910 | 323,714,900 | 112,501,010 | 326,133,963 |
| 1999 | 539,618,976 | 488,702,655 | 50,916,321 | 377,050,283 |

---

[27]We include data with respect to COB only because of our holding, infra par. A, that FSB did not request permission to change its method of accounting for overlimit fee and interchange income and therefore may not treat such income as increasing or creating OID.

Interchange Fees

| Taxable Year | Interchange Book Income | Income Recognized per KPMG Model | Difference: Book v. KPMG Model | Unamortized OID Bal. at End of Year |
|---|---|---|---|---|
| 1995 | $76,425,718 | $26,786,819 | $49,638,899 | $49,638,899 |
| 1996 | 97,892,344 | 68,308,342 | 29,584,002 | 79,222,901 |
| 1997 | 109,487,559 | 94,175,860 | 15,311,699 | 94,534,599 |
| 1998 | 168,336,313 | 126,972,006 | 41,364,307 | 135,898,906 |
| 1999 | 298,347,199 | 223,016,501 | 75,330,698 | 211,229,604 |

OPINION

A.   Accounting Methods

In 1997 Congress added section 1272(a)(6)(C)(iii) to allow taxpayers to change their method of accounting to accrue original issue discount on a pool of credit card receivables. TRA sec. 1004.  Rev. Proc. 98-60, app. sec. 12, 1998-2 C.B. 759, 786, provided procedures by which taxpayers could receive "automatic consent" to change their method of accounting for pools of credit card receivables in accordance with section 1272(a)(6)(C).  Under the revenue procedure, automatic consent was achieved by filing Form 3115 with a taxpayer's return.  Id. sec. 6.02, app. sec. 12, 1998-2 C.B. at 765, 786.

Our previous Opinion addressed the parties' cross-motions for partial summary judgment on the issue of whether COB and FSB were permitted to change their treatment of 1998 and 1999 late-fee income to the method called for by section

1272(a)(6)(C)(iii).  We held that COB, which submitted Form 3115 but did not change its method of accounting for late fees in 1998 or 1999, and FSB, which did not submit Form 3115 or change its method of accounting for late fees, could not retroactively change their methods of accounting for late fees under section 446(e).  Capital One Fin. Corp. v. Commissioner, supra at 156-170.

Respondent argues that because FSB did not submit Form 3115 in 1998 or 1999, requesting to change its method of accounting for interchange or overlimit fees, it may not now treat those fees as creating or increasing OID under section 1272(a)(6)(C)(iii).  As we stated in our prior Opinion:

> In the light of the purposes for requiring notification to the Commissioner of a taxpayer's change in method of accounting, the Court holds that petitioners were required to follow all applicable procedures put in place by respondent in order to receive consent to  change their method of accounting to comply with section 1272(a)(6)(C)(iii).  See Rev. Proc. 98-60, 1998-2 C.B. 759.  Failure to follow those procedures would negate automatic consent to the proposed change.

Capital One Fin. Corp. v. Commissioner, supra at 158.  FSB did not follow the applicable procedures to receive consent to change its method of accounting.  Therefore, it may not treat its relevant credit card receivables as creating or increasing OID under section 1272(a)(6)(C)(iii) in 1998 or 1999.

B.    The Standard of Review

No specific precedent articulates the standard to apply in determining whether a taxpayer's assumptions used to calculate the proper amount of OID included in gross income in a given year are proper.  Although section 1.1272-1(b)(1)(ii) and (4)(iii), Income Tax Regs., provides reasonableness standards for computing the length of accrual periods and the amount of OID allocable to the initial accrual periods, section 1.1272-1(b)(2)(i), Income Tax Regs., provides that paragraph (b)(1) does not apply to debt instruments subject to section 1272(a)(6).  However, section 1.671-5(g)(1)(iv)(A)(2), Income Tax Regs., provides that in calculating OID under section 1272(a)(6)(C), the trustee of a widely held mortgage trust in certain circumstances "may use any reasonable prepayment assumption to calculate OID".[28]

Section 1272(a)(6)(B)(iii) requires taxpayers to use a prepayment assumption as prescribed by regulations.  No such regulations have been issued.  The models developed by KPMG and by respondent's expert call for the use of estimates.  Under these circumstances, COB's assumptions and calculations used to determine the amount of OID included in its gross income will be respected so long as the assumptions and calculations are

_____

[28]The regulation provides trustees of widely held mortgage trusts a safe harbor for reporting OID before the issuance of final regulations under sec. 1272(a)(6)(C)(iii).  No final regulations have been issued.

reasonable.  Petitioners and respondent, in their briefs, agree that a reasonableness standard is appropriate.  However, the KPMG model may not run afoul of the statutory scheme for calculating the accrual of OID in general nor run afoul of section 1272(a)(6) in particular.

Respondent also notes his authority to require a certain method of tax accounting when the taxpayer's method of accounting fails to reflect the taxpayer's income clearly.  Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); Commissioner v. Hansen, 360 U.S. 446, 467 (1959); see also sec. 1.446-1(a)(2), Income Tax Regs.  Section 446 provides in part:

> SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.
>
> (a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.
>
> (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

We generally give deference to the Commissioner's determination that a taxpayer's method of accounting does not clearly reflect income.  However, if a taxpayer uses a method of accounting which clearly reflects income, the Commissioner is not authorized to adjust a taxpayer's method of accounting to a method that may more clearly reflect income.

Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995); Bay States Gas Co. v. Commissioner, 75 T.C. 410, 422 (1980), affd. 689 F.2d 1 (1st Cir. 1982); Garth v. Commissioner, 56 T.C. 610, 623 (1971).

Where a taxpayer is required to use assumptions and estimates to compute the accrual of OID, a reasonableness standard is appropriate.  Further, a reasonable method of calculating the accrual of OID under section 1272(a)(6)(C)(iii) will generally clearly reflect income within the meaning of section 446.

As described below, we find that in some respects the KPMG model does not comply with the OID rules and regulations.  The methods used for calculating the accrual of OID must comply with those rules and regulations.

C.   Section 1272(a)(6)(C)

In the case of (1) any regular interest in a real estate mortgage investment conduit (REMIC), (2) qualified mortgages held by a REMIC, or (3) any other debt instrument if payments under the instrument may be accelerated by reason of prepayments of other obligations securing the instrument, the daily portion of the OID on such debt instruments is determined by taking into account an assumption regarding the prepayment of such instruments.  Sec. 1272(a)(6).

Section 1272(a)(6)(A) provides:

    (A) In general.--In the case of any debt instrument to which this paragraph applies, the daily portion of the original issue discount shall be determined by allocating to each day in any accrual period its ratable portion of the excess (if any) of--

        (i) the sum of (I) the present value determined under subparagraph (B) of all remaining payments under the debt instrument as of the close of such period, and (II) the payments during the accrual period of amounts included in the stated redemption price of the debt instrument, over

        (ii) the adjusted issue price of such debt instrument at the beginning of such period.

The computation is represented by the following mathematical equation: $OID_n = [Cashflow_n + AIP_n] - AIP_{n-1}$.

Where: $OID_n$ = OID for the period.

$Cashflow_n$ = amounts included in the SRPM received in the current accrual period.

$AIP_n$ = present value of all remaining payments as of the end of the period or adjusted issue price at the end of the period.

$AIP_{n-1}$ = adjusted issue price at the beginning of the period.

Section 1272(a)(6)(A) requires COB to compute the present value of all payments remaining to be made on its pool of credit card receivables at the end of the accrual period. Section 1272(a)(6)(B) provides guidance with respect to determining the present value:

(B) Determination of present value.--For purposes of subparagraph (A), the present value shall be determined on the basis of--

        (i) the original yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period),

        (ii) events which have occurred before the close of the accrual period, and

        (iii) a prepayment assumption determined in the manner prescribed by regulations.

No regulations have been promulgated with respect to the prepayment assumption that must be made in valuing credit card receivables.  The legislative history of the TRA provides some guidance as to how taxpayers are to calculate OID on a pool of credit card receivables:

> if a taxpayer holds a pool of credit card receivables that require interest to be paid if the borrowers do not pay their accounts by a specified date, the taxpayer would be required to accrue interest or OID on such a pool based on a reasonable assumption regarding the timing of the payments of the accounts in the pool. * * *

H. Conf. Rept. 105-220, at 522 (1997), 1997-4 C.B. (Vol.2) 1457, 1992.

The "timing of the payments of the accounts in the pool" is critical because the present value of a future payment decreases as the payment date becomes more distant, hence the adage "a dollar today is worth more than a dollar in the future."  For example, assuming a 10-percent interest rate, the present value of $100 to be received in 1 year is $90.91.  The present value of

$100 to be received in 2 years is $82.65, and so forth. The
present value of a payment to be received in the future is
represented by the following formula:

$$\text{Present Value} = \frac{\text{Future Value}}{(1 + R)^n}$$

Where: n = the number of periods until the payment is received.

R = interest rate.

D.  The KPMG Model

    1.  The Payment Rate or Prepayment Assumption

With respect to credit card loans, there is no fixed date by
which a loan needs to be paid off. Therefore, a prepayment
assumption under section 1272(a)(6)(B)(iii) is simply a payment
rate. There is a direct correlation between the payment rate and
the amount of OID to be recognized. The higher the payment rate,
the more quickly COB recognizes OID; the lower the payment rate,
the more slowly COB recognizes OID. The KPMG model assumes that
the actual cash collected during each period is the best evidence
of the expected future payment rate.

Under the KPMG model, the payment rate is a fraction where
the numerator is cash collections net of finance charges and the
denominator is the beginning credit card receivable balance plus
that month's new additions (excluding finance charges). For
purposes of computing OID, COB treats stated finance charges as
"stated interest" and recognizes such interest as income

currently as it is billed to the cardholder.  Therefore stated finance charges are not included in either the numerator or the denominator of the payment rate.[29]  The payment rate is calculated using the following formula:

 Payments - Stated Finance Charges 
Outstanding Balance + New Additions

The KPMG model uses a constant monthly payment rate.  For example, on a $100 debt with a 10-percent payment rate, after 1 month the outstanding debt will be $90, after 2 months it will be $81, after 3 months it will be $72.90, and so forth.  In this way the payments continue forever with the debt becoming infinitesimally small.  Assuming a 10-percent payment rate, 72 percent of the balance will be paid in 12 months, 92 percent in 24 months, and 98 percent in 36 months.

From 1995 to 1999 the payment rate for COB's pool of credit card receivables was calculated under the KPMG model to be an average of 8.91 percent.

---

[29]Although they dispute the manner in which it should be done, the parties agree that stated finance charges are stated interest and should be excluded from the payment rate calculation.

COB'S MONTHLY AND AVERAGE PAYMENT RATES

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1995 | 9.07 | 9.05 | 9.73 | 8.03 | 8.67 | 8.35 | 8.46 | 8.02 | 7.21 | 8.90 | 8.47 | 7.66 | 8.47 |
| 1996 | 9.43 | 9.51 | 9.36 | 9.26 | 8.34 | 7.75 | 8.65 | 7.58 | 7.66 | 7.96 | 7.34 | 7.62 | 8.37 |
| 1997 | 8.16 | 8.23 | 8.82 | 8.01 | 8.77 | 8.92 | 8.59 | 8.00 | 8.20 | 8.58 | 8.22 | 8.53 | 8.42 |
| 1998 | 8.97 | 8.64 | 10.02 | 9.13 | 8.85 | 8.92 | 8.71 | 9.00 | 8.35 | 9.55 | 8.80 | 8.30 | 8.94 |
| 1999 | 8.85 | 9.39 | 11.01 | 9.94 | 10.72 | 9.87 | 10.70 | 10.54 | 10.77 | 10.98 | 10.68 | 10.70 | 10.35 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | **8.91** |

The payment rate is critical to the calculation of OID because it is used to calculate the weighted average maturity (WAM) and the yield to maturity (YTM), both of which enter into the calculation of the present value of future expected payments.

2.   The Weighted Average Maturity

In the KPMG model the WAM is the inverse of the payment rate and is expressed in months.  For example, the WAM of a pool of debt instruments with an expected payment rate of 10 percent is 10 months (1 divided by .1 = 10).  If the payment rate is 20 percent, the WAM is 5 months (1 divided by .2 = 5).

The calculation of the WAM is a simplifying assumption in the present value calculations.  In reality some cardholders make payments on their loan earlier and some later.  The WAM is a mathematical assumption of a single point at which on average all cardholders will pay off their debt.

Rather than calculating the present value of each of a series of unequal periodic payments of the pool every month, the

KPMG model simplifies the process by using the WAM to limit the calculation to the present value of one payment (equal to the relevant balance of the entire pool) at the WAM. Specifically, the WAM is the number of periods, or "n" in the present value formula used in the KPMG model.

$$\text{Present Value} = \frac{\text{Future Value}}{(1 + R)^n} \quad \text{or} \quad \frac{\text{Future Value}}{(1 + R)^{WAM}}$$

From 1995 to 1999 the WAM of COB's pool of credit card receivables was calculated to be on average 11.35 months and the average WAM for 1998 and 1999 was 10.46 months.

Monthly and Average WAM

|      | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | AVG |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 1995 | 11.02 | 11.05 | 10.28 | 12.45 | 11.54 | 11.98 | 11.82 | 12.47 | 13.87 | 11.24 | 11.81 | 13.06 | 11.88 |
| 1996 | 10.61 | 10.51 | 10.68 | 10.80 | 11.99 | 12.90 | 11.56 | 13.20 | 13.05 | 12.56 | 13.63 | 13.12 | 12.05 |
| 1997 | 12.25 | 12.14 | 11.34 | 12.48 | 11.40 | 11.21 | 11.64 | 12.50 | 12.20 | 11.65 | 12.17 | 11.72 | 11.89 |
| 1998 | 11.15 | 11.58 | 9.98 | 10.96 | 11.29 | 11.21 | 11.48 | 11.12 | 11.98 | 10.48 | 11.36 | 12.05 | 11.22 |
| 1999 | 11.29 | 10.65 | 9.08 | 10.06 | 9.33 | 10.13 | 9.34 | 9.49 | 9.29 | 9.11 | 9.36 | 9.34 | 9.71 |
|      |  |  |  |  |  |  |  |  |  |  |  |  | **11.35** |

3.   The Yield to Maturity

In the KPMG model, the YTM is calculated using a formula in a Microsoft Excel worksheet to derive the interest rate at which the sum of the net present values of all of the future payments is equal to the issue price of the debt pool. The issue price is the amount of cash advanced by COB as the issuing bank to acquire the debt. Specifically, the YTM is calculated using the RATE

function in Excel, which is expressed as follows: RATE = (Nper, Pmt, PV, FV).

In this formula: (1) Nper is the total number of payment periods for the loan and Nper is equal to the WAM; (2) Pmt is the payment made each period and Pmt equals zero for purposes of this calculation (there are no monthly payments assumed but rather the entire SRPM (FV)) is considered collected at the WAM; (3) PV is the present value, the total amount that a series of future payments is worth at that point and PV equals Beginning Issue Price (including new additions)/SRPM (including new additions); and (4) FV is the future value, or a cash balance you wish to attain after the last payment is made and FV equals 1.

Calculating the YTM assuming payment of the SRPM at the WAM is the mathematical equivalent of any combination of prepayment assumptions that pays off the SRPM over various other periods with the same WAM.

With a YTM and a WAM, the KPMG model then calculates the present value of the future payment stream.

4. <u>OID Accrual</u>

Having determined a payment rate, a WAM, and a YTM, the KPMG model then uses a beginning issue price, an ending issue price, and principal payments for every month, which are derived from COB's financial accounting reports. The beginning issue price is the issue price of the pool at the beginning of the month (the

SRPM less OID accrued for prior periods) plus new additions during the month (new principal). The ending issue price is the present value of the future cashflow. The principal payments are the actual principal payments received during the month. The KPMG model then determines the unadjusted OID accrual for a given month using the formula: $OID_n = [\text{Cash flow}_n + AIP_n] - AIP_{n-1}$.

### 5. An Adjustment for Writeoffs

The KPMG model incorporates a section 166 Schedule M-1 adjustment for book/tax basis differences in receivables written off by recognizing an additional and proportional amount of income to offset the portion of the writeoff expense that had not been previously accrued in income.

### 6. The Mid-Month Convention

The KPMG model assumes that all charges or lending transactions creating the monthly pool occur on the 15th of the month. The model therefore allocates fourteen-thirtieths of the OID for each monthly period to the calendar month of the calculation and sixteen-thirtieths to the following calendar month.

### 7. The KPMG Model Table

The following chart shows the KPMG model's calculations of OID for overlimit fees for the first 3 months of 1999.[30]

---

[30]Figures are taken directly from Exhibit 11-J and have not been adjusted for mathematical errors.

KPMG/Rolling Balance OID Calculator
      Capital One Financial Corporation (COB)
      1999 - Overlimit Fees

| Credit Card Fee Pool for Month | 1 | 2 | 3 |
|---|---|---|---|
| **OID Created:** | | | |
| (A) Unamortized OID At Beginning of Period (overlimit fees) | 311,048,903 | 325,983,582 | 331,054,419 |
| (B) Total New Additions of OID (overlimit fees) | 48,238,609 | 41,029,513 | 43,915,549 |
| (C) Total OID Before Current Month Amortization (A+B) | 359,287,512 | 367,013,095 | 374,969,968 |
| **SRPM** | | | |
| (D) SRPM At Beginning of Month | 15,572,919,690 | 15,602,686,253 | 15,243,211,562 |
| (E) Monthly Principal Addition | 1,545,483,606 | 1,220,461,154 | 1,844,061,105 |
| (F) Total SRPM After New Addition (D+E) | 17,118,403,196 | 16,823,147,407 | 17,087,272,667 |
| (G) Total SRPM at End of Month (F-I) | 15,602,686,253 | 15,243,211,562 | 15,205,183,121 |
| **Adjusted Issue Price** | | | |
| (H) Beginning Issue Price (Incl. New Addition (F-C)) | 16,759,115,684 | 16,456,134,312 | 16,712,302,699 |
| Constant Yield (Monthly) | 0.1879921% | 0.2073659% | 0.2446986% |
| (I) Principal Payment | 1,515,716,943 | 1,579,935,845 | 1,882,089,546 |
| (J) Ending Issue Price (PV of Future Cash Flow) | 15,275,211,181 | 14,910,666,283 | 14,871,514,481 |
| **Reversal of Unamortized OID On Write Offs** | | | |
| (K) Ending Issue Price /SRPM (J/G) | 97.90% | 97.82% | 97.81% |
| (L) Basis Adjustment Percentage (I-K) | 2.10% | 2.18% | 2.19% |
| (M) Gross Write Offs | 71,062,684 | 68,338,064 | 76,530,491 |
| (N) Reversal of Unamortized OID on Write Offs (Basis Adjustment) | 1,491,490 | 1,490,860 | 1,679,416 |

|  | 1 | 2 | 3 |
|---|---|---|---|
| **OID Amortization** | | | |
| (O) OID Amortization (I+J-H) | 31,812,440 | 34,467,816 | 41,301,328 |
| (P) Reversal of Unamortized OID on Write Offs (Basis Adjustment) | 1,491,490 | 1,490,860 | 1,679,416 |
| (Q) Unamortized OID at Ent of Period (C-O-P) | 325,983,582 | 331,054,419 | 331,989,224 |
| **OID Amortization on Calendar Month Basis** | | | |
| (R) Prior Period OID Recognized in Current Calendar Month | 15,085,059 | 16,966,634 | 18,382,835 |
| (S) Current Period OID to be Recognized in Next Calendar Month | 16,966,634 | 18,382,835 | 22,027,375 |
| (T) Adjusted OID Amor. for Calendar Month (O+R-S) | 29,930,865 | 33,051,615 | 37,656,788 |
| (U) Unamortized OID at End of Calendar Month (Q+S) | 342,950,217 | 349,437,254 | 354,016,599 |
| (V) Tax Adj. Inc. Recognized Per Calendar Month (T+P) | 31,422,355 | 34,542,475 | 39,336,204 |

E.   Respondent's Arguments With Respect to the KPMG Model

Respondent argues that the results produced by the KPMG model are unreasonable and do not clearly reflect COB's income. Respondent raises a number of specific issues with respect to the KPMG model and proposes corrections and adjustments which respondent argues are necessary for COB's income to be clearly reflected.

1.   The Monthly Retirement and Reissuance of the Pooled Debt Instrument

Respondent argues that the formulas and concepts originally used for accruing OID on REMICs should apply in some reasonable fashion to accruals of OID on a pool of revolving credit card

debt.  A REMIC is a fixed pool of mortgages that pays down as the underlying mortgages are themselves paid down.  OID accruals with respect to a REMIC are typically computed according to the speed at which the REMIC's entire pool of mortgages pays down over time.  See sec. 1272(a)(6)(A) and (B).  Unlike a REMIC, COB's credit card loan pool is dynamic, with cardholders making payments and incurring new principal additions each month, and with some cardholder accounts terminating as others enter the pool.

Respondent concedes that COB's revolving pool of credit card loans does not fit comfortably into the fixed-pool REMIC model.  Respondent also concedes that the KPMG model seeks to apply fixed-pool accounting to a dynamic pool of credit card loans by using a 1-month instrument that is retired and reissued, referred to as the "rolling balance" method.  However, respondent argues that "this notion of a 'retired' and 'reissued' debt is the antithesis of a fixed pool of self-amortizing debt like that of a REMIC."  Petitioners find themselves in a difficult situation.  Under respondent's theory, COB should use the fixed-pool accounting rules applicable to REMICs.  However, COB's pool of loans is not fixed.  To try to apply fixed-pool accounting to the dynamic pool of credit card loans, COB uses a 1-month fixed pool that is retired and reissued at the end of each month.  Respondent argues that this method is unreasonable.

We ask two questions.  First, what authority did COB rely upon when adopting the retired and reissued approach?  Second, what alternative does respondent suggest?

a.    COB's Reasons for Adopting the "Retired and Reissued" Approach

To solve the problem of how to apply fixed-pool accounting to a dynamic pool of loans, Dennis Nelson, the KPMG partner responsible for developing the KPMG model, looked to the OID regulations to determine how OID is calculated when a debt instrument is modified or there is a change in circumstance. Section 1.1272-1(c), Income Tax Regs., provides rules to determine the yield and maturity of certain debt instruments that provide for an alternative payment schedule applicable upon the occurrence of a contingency.  "If a contingency * * * actually occurs or does not occur, contrary to the assumption made * * * [by the taxpayer] then * * * the debt instrument is treated as retired and then reissued on the date of the change in circumstances for an amount equal to its adjusted issue price on that date."  Sec. 1.1272-1(c)(6), Income Tax Regs.  Section 1.1275-2(h), Income Tax Regs., provides rules for debt instruments subject to remote and incidental contingencies.  If a change in circumstance occurs, "the debt instrument is treated as retired and then reissued on the date of the change in circumstances for an amount equal to the instrument's adjusted issue price on that date."  Sec. 1.1275-2(h)(6)(ii), Income Tax

Regs.  Similarly, section 1.1275-2(j), Income Tax Regs., provides that

> If the terms of a debt instrument are modified to defer one or more payments, and the modification does not cause an exchange under section 1001, then, solely for purposes of sections 1272 and 1273, the debt instrument is treated as retired and then reissued on the date of the modification for an amount equal to the instrument's adjusted issue price on that date. * * *

None of the above-quoted regulations apply directly to a pool of credit card loans.  In fact, none of the OID regulations apply directly to the issue at hand.  However, petitioners argue that these regulations provide an apt analogy, and we agree.

A pool of credit card loans, the debt instrument, is constantly modified as cardholders make principal payments, charge additional purchases, transfer balances, and incur various types of fees, many of which are contingent and cannot be anticipated at the time the loan is made.  The retirement of a debt instrument under the regulations generally results in no gain or loss but requires the rolling of unamortized OID into a newly issued debt instrument to be taken into account over the new debt instrument's anticipated life.

b.    Respondent's Alternative to the "Retired and Reissued" Approach

There are significant practical difficulties in developing a model without the retired and reissued approach, in other words a model with static pools.  Mr. Nelson testified:

in the end, it was an absolute nightmare. They couldn't reconcile the results. They didn't know how to allocate the payments. Because in the end, it all came down to what payments should we assign to these static pools that we created. And they didn't have a good way of being able to assign that. Their results were totally dependent on how to assume the payments were spread among these static pools. So they created mountains of work for the client and ourselves.

Respondent maintains that the most accurate way to calculate OID would be cardholder by cardholder, but concedes that the sheer number of cardholders would make such calculations burdensome. More importantly, section 1272(a)(6)(C)(iii) applies the OID rules to a pool of loans, and there is no authority suggesting that COB was required to calculate OID individually for each of its millions of cardholders.

Under the KPMG model an accrual of a single item of OID can extend beyond the underlying indebtedness to which the OID relates because the KPMG model applies payments proportionally across all outstanding debt. Respondent argues that COB must track or trace its cardholder accounts on a first-in, first-out (FIFO) basis so as to match the OID earned with the particular loan transaction that gives rise to the OID. Respondent describes the difference between the parties' positions:

Petitioners contend that the credit card fees attributable to specific cardholder accounts and accrual periods should be treated, instead, as OID arising in the aggregate on the constantly changing balance of that pool. Petitioners are not troubled by the prospect that, under the KPMG model, a cardholder could close his account and transfer his balance to another lender, yet leave unamortized OID on

petitioners' books.  Nor are petitioners troubled by the fact that, under the KPMG model, cardholders can transfer balances to petitioner from other lenders as to which no OID exists, even though such transactions, when commingled with petitioners' cardholder loans on which there is OID, will dramatically slow the rate at which OID is accrued on those older accounts and balances that do not have OID.

Respondent demonstrates the problem by providing an illustration of a single cardholder who makes a $600 purchase and incurs a $40 overlimit fee in month 1, then makes principal payments and charges new purchases in the following months.

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Balance | 0 | 640 | 600 | 600 | 600 | 600 | 600 | 600 |
| Purchases | 600 | 56 | 90 | 90 | 90 | 90 | 90 | 90 |
| Overlimit | 40 | | | | | | | |
| Total with New Charges | 640 | 696 | 690 | 690 | 690 | 690 | 690 | 690 |
| Payments | | 96 | 90 | 90 | 90 | 90 | 90 | 94 |
| Payment Rate | 0% | 15% | 15% | 15% | 15% | 15% | 15% | 15.67% |
| Amortized OID | 0 | 6 | 5.10 | 4.34 | 3.68 | 3.13 | 2.66 | 2.36 |
| Unamortized OID | 40 | 34 | 28.90 | 24.57 | 20.88 | 17.75 | 15.09 | 12.72 |

Respondent argues that because the cardholder paid a total of $640 (the amount of the original loan plus the overlimit fee) COB should recognize the entire fee.  The effect is to suggest that a payment rate of 15 percent translates into an actual liquidation of the debt in 8 months.  Essentially, respondent contends that each payment should go toward the oldest debt first and any OID related to that debt.  Respondent has no authority

for this position other than his argument that a FIFO method would clearly reflect COB's income.

Petitioners argue that using a constant payment rate of 15 percent, the cardholder will still have $241 remaining on the original debt, or 32 percent of the original debt, and 32 percent of the OID will remain unamortized.

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Balance | 0 | 640 | 544 | 462 | 393 | 334 | 283 | 241 |
| Purchases | 600 | | | | | | | |
| Overlimit | 40 | | | | | | | |
| Total With New Charges | 640 | 640 | 544 | 462.40 | 393.04 | 334.08 | 283.97 | 241.38 |
| Payments | | 96 | 81.60 | 69.36 | 58.96 | 50.11 | 42.60 | 36.21 |
| Payment Rate | | 0% | 15% | 15% | 15% | 15% | 15% | 15% |
| Amortized OID | 0 | 6 | 5.10 | 4.34 | 3.68 | 3.13 | 2.66 | 2.26 |
| Unamortized OID | 40 | 34 | 28.90 | 24.57 | 20.88 | 17.75 | 15.09 | 12.82 |

Petitioners argue that the KPMG model is thus proportional in that the cardholder recognizes OID at the same rate as the original debt is repaid.

The KPMG model accrues OID on the basis of the actual payment rates of COB's cardholders.  If COB's cardholders actually pay off their debts as quickly as the following hypothetical suggests, COB would recognize OID more quickly.

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Balance | 0 | 640 | 544 | 454 | 364 | 274 | 184 | 94 |
| Purchases | 600 | | | | | | | |
| Overlimit | 40 | | | | | | | |
| Total With New Charges | 640 | 640 | 544 | 454 | 364 | 274 | 184 | 94 |
| Payments | | 96 | 90 | 90 | 90 | 90 | 90 | 94 |
| Payment Rate | 0% | 15% | 16.54% | 19.82% | 24.73% | 32.85% | 48.91% | 100% |
| Amortized OID | 0 | 6 | 5.63 | 5.63 | 5.63 | 5.63 | 5.63 | 5.85 |
| Unamortized OID | 40 | 34 | 28.38 | 22.75 | 17.13 | 11.50 | 5.88 | 0 |

COB's cardholders, on a pooled basis, do not pay off their debts at anywhere near the rates suggested by the hypothetical. Further, COB's cardholders do not pay off a fixed amount of principal each month on their existing debt because they add new purchases every month and some portion of the payments may apply to the new debt.

This is a fundamental difference between the parties. Respondent views COB's pool of debt as made up of hundreds of millions of loans made to millions of cardholders. Petitioners view the pool as a single debt instrument. Dr. Hakala, respondent's expert, and respondent assume that cardholders pay off a constant amount on their credit card debt in the same way that a debtor pays off a fixed debt. Respondent and Dr. Hakala assert that a group of fixed pools may be more appropriate and would clearly reflect income. However, Dr. Hakala's models do not use fixed

pools.   Rather, Dr. Hakala uses a FIFO method,[31] and there are significant problems with it.

The FIFO method amortizes OID in a straight line to the WAM so that all OID is accrued by the WAM.  This rapidly accelerates the accrual of OID because an adjusted WAM is required.  Dr. Hakala reweighted the WAMs according to the relative duration of each month's balance of unamortized OID in the collective pool of unamortized OID.  Dr. Hakala's adjustment is designed to match OID accruals to the actual liquidation of the pertinent debt.  However, he ignores the fact that some cardholders actually make principal payments after the WAM.  Most importantly, Dr. Hakala's FIFO adjustment abandons the section 1272(a)(6) formula:  $OID_n = [Cash flow_n + AIP_n] - AIP_{n-1}$.  Dr. Hakala calculates the OID simply by multiplying the beginning issue price (including new additions) by the YTM.

Respondent argues that Dr. Hakala's formula for computing OID is a close approximation of the section 1272(a)(6) formula.  That may be true; however, Congress provided the section 1272(a)(6) formula, and we cannot require COB to use some other formula no matter how similar to the formula provided in the Code.  Furthermore, we cannot find a taxpayer's method of accounting which

---

[31]Petitioners argue that Dr. Hakala's method is not actually a FIFO method.  As we find Dr. Hakala's method unreasonable and at odds with sec. 1272(a)(6), we need not address petitioners' arguments on this point.

follows a formula provided by Congress to be unreasonable because a different formula may more clearly reflect the taxpayer's income.

We conclude that COB's use of a retired and reissued debt instrument, as provided for in the regulations under similar circumstances, is a reasonable method of implementing the formula provided in section 1272(a)(6) given the inherent difficulties in applying fixed-pool accounting to a dynamic pool of loans. Furthermore, respondent's adjustments to this aspect of the KPMG model are unreasonable and at odds with section 1272(a)(6).

2.    The Inclusion of New Additions in the Beginning Issue Price

The KPMG model uses a beginning issue price which includes new cardholder purchases and other charges (additions in the parlance of the KPMG model). The name given to this figure by KPMG is descriptive: "Beginning issue price (including new additions)". This figure is derived by subtracting the sum of the carryover balance of unamortized OID and the current month's fee to be treated as OID from "Total SRPM After New Additions", which is the SRPM at the beginning of the accrual period plus new additions.[32] Respondent argues that the use of a beginning issue price that includes new additions results in an incorrect determination of OID accruals.

_____

[32]The difference between the AIPbeg figure respondent contends must be used and the AIPbeg figure used by the KPMG model is the present value of the current month's aggregate new cardholder purchases and charges.

Section 1272(a)(4) provides:

> (4) Adjusted issue price.--For purposes of this subsection, the adjusted issue price of any debt instrument at the beginning of any accrual period is the sum of--
>
> > (A) the issue price of such debt instrument, plus
> >
> > (B) the adjustments under this subsection to such issue price for all periods before the first day of such accrual period.

The parties agree that the additions that occur after the start of the accrual period cannot be included in the AIPbeg figure under section 1272(a)(4)(B). However, petitioners argue that new additions are included under section 1272(a)(4)(A):

> Respondent, however, fails to take into account the "retired and reissued" approach described above. Applying the concept of a monthly pool that is deemed to be retired and reissued at its adjusted issue price, the result is a monthly rolling pool with the issue price of the new pool each month equal to the adjusted issue price of the prior month-end, increased for the issue price of new loans to cardholders in the pool prior to the assumed reissue date. In essence, the clock is "reset" to the beginning of the period every month. Therefore, the issue price of the newly reissued debt under section 1272(a)(4)(A) (not section 1272(a)(4)(B)) must include the Additions. Similarly, the SRPM is equal to the SRPM at the prior month-end, increased by net new additions to cardholder accounts in the pool.

The regulations petitioners cite as authority for the use of a retired and reissued instrument suggest that new additions should not be included retroactively in the AIPbeg figure. For example, section 1.1272-1(c)(6), Income Tax Regs., provides that the debt instrument is treated as retired and reissued on the

<u>date of the change in circumstances</u>.  In the case of a pool of credit card loans, the KPMG model retires and reissues the debt instrument on the first day of every month.  So on January 1, 1999, the pool of debt instruments is retired, and the debt instrument is reissued for the issue price on that date. Unamortized OID is rolled over to the next period (January), and the debt instrument is then retired and reissued on February 1, 1999.  The regulations do not provide that at the end of the period, for example January 31, the taxpayer should look backward and recompute the January 1 issue price on the basis of events that occurred during January.

However, we must acknowledge the differences between a pool of debt instruments and the types of debt instruments assumed for purposes of the regulations.  COB's pool of credit card debt is constantly changing.  The regulations posit a single change in circumstances; i.e., the exercise of an option.  Yet COB cannot recompute the various components of the section 1272(a)(6) formula constantly.  It must pick a period and calculate the OID accrual for that period.  COB chose to do so monthly, which is reasonable given the nature of the credit card business.

In support of their positions on this issue, the parties again demonstrate a fundamental difference in the way they view a credit card loan.  Petitioners argue that it is appropriate to include new additions in the AIPbeg figure because each credit

card purchase transaction that occurred in a given month was an outstanding loan at the end of month. In petitioners' view the loan becomes part of the SRPM at the time the loan is made (or at least at the time it is settled under the associations' systems, usually 1 day later). Therefore, it is appropriate to include new additions in the issue price for the purpose of calculating the accrual of OID.

Respondent argues that it is inappropriate to include new additions because they have not been billed, that is, a statement has not been sent to the cardholder requesting payment until later in the current month or in the following month, and payments are not due until 30 days after the issuance of the statement.

Although petitioners argue that new additions are included in the AIPbeg figure under section 1272(a)(4)(A), we cannot ignore section 1272(a)(4)(B). Subparagraph (B) makes clear that the beginning issue price includes only the adjustments to the issue price included before the first day of the accrual period. The reissuance of the pool of debt instruments occurs on the first day of every month; i.e., the first day of the accrual period. It is inappropriate under either section 1272(a)(4)(A) or (B) to include in the issue price the additions that occurred on or after the first day of the accrual period.

3.    Payment Rate Issues

Under the KPMG model, the payment rate is a fraction where the numerator is cash collections net of finance charges and the denominator is the beginning credit card receivable balance plus that month's new additions (net of finance charges):

Payments - Stated finance charges
Outstanding Balance + New additions

Respondent raises several issues with respect to the calculation of the payment rate.

a.    The Denominator

Respondent argues that the inclusion of current month cardholder charges and fees in the calculations used to derive the payment rate is inappropriate because those new charges would not have been billed until later in the current month or in the next month, and would not have been due until 30 days after the charges were billed.  We agree with respondent on this point.

A simple example helps illustrate the calculation of the payment rate in the KPMG model.  Assume a cardholder purchases a $100 lamp, $40 of gasoline, and $10 of coffee in November, for a total of $150.  In December the cardholder charges a $25 haircut, incurs a $25 overlimit fee, and incurs $10 in stated finance charges, resulting in a balance of $210.  In December the cardholder also makes a payment of $30.  Under the KPMG model, the December payment rate would be 10 percent ($20 payment

(exclusive of finance charges) divided by a $200 balance (also excluding finance charges)).

In the example, the cardholder pays $30 after receiving a monthly statement from COB on December 1. The statement would have shown that the cardholder owed $150. No finance charges would have been billed to the cardholder because it was possible he would pay his entire balance and incur no finance charges. Therefore, when the cardholder pays $30, it is toward a $150 balance, resulting in a payment rate of 20 percent. It is unreasonable to conclude that the cardholder's December payment rate is 10 percent simply because she incurs new charges when those charges are not yet billed to her.

However, respondent goes even further, arguing that the additions made after the average statement date[33] of the prior month should also not have been included because those charges would not have been billed until the current month. For example, when calculating the December payment rate, respondent argues that a charge made on November 25 should not have been included in the total outstanding balance portion of the denominator. We disagree with respondent on this point. Although payment of the November 25 charge may not have been due until January, COB would

---

[33]COB issues statements to its cardholders throughout the month, and given that the typical billing cycle is 30 days, the average monthly statement date for all cardholders is the middle of the month.

have requested payment of the debt during December, and it is appropriate to include it in the denominator when calculating the payment rate.

Therefore, the denominator of the payment rate formula should be the total cardholder outstanding balance as of the end of the previous month.

### b. The Numerator

The numerator of the payment rate calculation begins with the current month's payments and then subtracts the current month's accrued finance charges. Respondent agrees that finance charges must be subtracted from the payments, but disagrees as to which finance charges should be subtracted. The KPMG model subtracts finance charges accrued during the current month. Essentially, the KPMG model applies current month payments against the current month's accrued, but unbilled, finance charges. Respondent argues this is unreasonable for the same reasons new additions should not be included in the denominator, and we agree. It is inappropriate to apply payments to charges which have not been billed.

Respondent argues that the finance charges which should have been subtracted are two-thirds of the prior month's finance charges and one-third of the finance charges from the month

before that.[34]  In determining the beginning issue price of the debt instrument and the denominator of the payment rate calculation, it is appropriate to include all the prior month's additions to principal whether billed or unbilled as of the first day of the current month because COB will request payment of those debts during the current month.  We think it logical, therefore, that current month payments should first be applied to finance charges which relate to all the debts included in the beginning issue price; i.e., the total outstanding balance of the pool as of the beginning of the accrual period.  In other words, current month payments should first be applied to prior month finance charges, but not current month finance charges or finance charges from 2 months previous, before reducing the principal amount.

In his calculations Dr. Hakala includes writeoffs in the numerator.  Writeoffs are those debts COB determines are not collectible.  Respondent argues that "a write-off, practically speaking, is no different from a payment of principal in that both reduce outstanding principal balances".  A writeoff, however, is an amount that is uncollectible, and it is not equivalent to a payment.  The payment rate is used to calculate future payments.  Including writeoffs in the calculation

_____

[34]Respondent also argues that one-half of the prior month finance charges should be deducted and one-half of the finance charges from the month before that.

anticipates future defaults.  The legislative history of section 1272(a)(6) suggests that defaults are not to be estimated when determining future cashflows.  H. Conf. Rept. 99-841 (Vol II), at II-238 n.22 (1986), 1986-3 C.B. (Vol.4) 1, 238 ("In computing the accrual of OID (or market discount) on qualified mortgages held by the REMIC, only assumptions about the rate of prepayments on such mortgages would be taken into account." (Emphasis added.)).  We conclude that writeoffs should not be included in the numerator when calculating payment rates.[35]

Therefore, the numerator of the payment rate formula should be the total cardholder payments for the current month less the finance charges accrued during the prior month.

c.   Other Published Payment Rates

Moody's Investors Services publishes historical credit card payment rates showing the average performance of various pools of credit card loans related to credit-card-backed securities.  In addition, Capital One files reports with the Securities and Exchange Commission and issues prospectuses related to its sale of credit-card-backed securities.  Each of these reports includes information about the payment rates of the loans that backed the securities.

---

[35]The KPMG model deals with writeoffs in a separate adjustment, which we conclude is reasonable.

However, these other published payment rates are not based upon the formula set out in section 1272(a)(6) and its related regulations. The published payment rate calculations include payments of finance charges which are left out of the section 1272(a)(6) formula because they are considered to be stated interest. Taking finance charges out of the equation, at least in the case of the numbers reported by Capital One, decreases the payment rates by approximately 1 percent of principal per period. For example, a payment rate of 10 percent including finance charges would be approximately 9 percent excluding finance charges.[36] Other adjustments were made in some calculations. For example, some of the calculations use an average outstanding principal amount for the month, rather than the outstanding amount at the beginning or end of the month.

Our determinations on these issues are based on section 1272(a)(6) and the related regulations, not on published reports that use an analysis not based in the Code.

4. Dr. Hakala's Default Rate Adjustment for Overlimit Fees

The KPMG model includes a section 166 adjustment for book/tax basis differences in receivables written off every month as reducing the end-of-month balance of unamortized OID.

---

[36]In 1999 COB cardholders made payments totaling $23,984,854,095, and accrued $2,088,871,186 in finance charges. In other words, approximately 9 percent of all payments were attributable to finance charges.

Respondent proposes to modify this writeoff adjustment for default rates associated with late fees and overlimit fees. Because of our determination in Capital One Fin. Corp. v. Commissioner, 130 T.C. 147 (2008), late fees are not at issue. Although they are not at issue, respondent argues that Dr. Hakala's analysis of the default characteristics of cardholders who incurred overlimit fees depends on his analysis of defaults associated with late fees.

Using data from Capital One's 310 reports, Dr. Hakala tracked the proportion of accounts that incurred late fees ultimately written off within 180 days of being in "non-payment" status. Dr. Hakala determined how much of a late fee is ultimately paid and how much is written off. On the basis of this analysis, respondent argues that a greater percentage of the outstanding principal in accounts that have incurred late fees is written off than in cardholder accounts generally. Dr. Hakala devised a default adjustment for late fees, expressed as a factor of 3.56, whereby the amount of OID recognized in connection with defaults is increased by a factor of 3.56. Again, late fees are not at issue, and we need not and do not reach a conclusion as to whether Dr. Hakala's late fee adjustment is appropriate.

Dr. Hakala was not able to do a similar analysis with overlimit fees. Instead, Dr. Hakala took samples of Capital One's cardholder accounts and compared default rates of accounts

with late fees versus default rates of accounts with overlimit fees. Using this sampling, Dr. Hakala determined that the default rate for accounts with overlimit fees was about half the default rate for late fees. Thus, in his corrections to the accruals of overlimit fees, he used a default factor of 1.78 versus 3.56 for late fees. However, Dr. Hakala provides insufficient data to allow us to test his conclusions. It seems that the 1.78 figure is a ballpark estimate or an educated guess that is based on the theory that cardholders who incur overlimit fees, like cardholders who incur late fees, have a higher rate of default.

Dr. Hakala also states that "customer accounts that incur past due and overlimit fees may tend to be slightly slower in paying off principal than the average customer, and this finding may moderate the adjustment." Dr. Hakala testified that he did moderate the adjustment, and therefore his default rate adjustment was not a 100-percent adjustment. But Dr. Hakala does not explain how or to what extent he moderated the adjustment.

Put simply, there is insufficient support for Dr. Hakala's proposed default rate adjustment. His ballpark estimate of the default rate factor may be correct or it may not. Without supporting data, we cannot conclude that the KPMG model was unreasonable or failed to clearly reflect COB's income as it relates to writeoffs. Further, on the record before us we cannot

conclude that Dr. Hakala's proposed default rate adjustment would more clearly reflect COB's income than did the KPMG model.

5.    Dr. Hakala's Seasonality and Trend Adjustment

As part of his adjustments to the KPMG model, Dr. Hakala included a seasonality adjustment to "smooth out seasonal fluctuations and to capture the trend in aggregate payment rates for forecasting purposes."  For example, the adjustment addresses the spike in credit card use and dip in payment rates associated with holiday shopping.  Dr. Hakala testified that adjustments for seasonality and trends are standard practice for purposes of prepayment assumptions in REMICs.  Mr. Nelson, on the other hand, testified that seasonality adjustments are not standard practice for REMICs.

Respondent contends that a seasonality adjustment is necessary because the payment rates in some months were artificially high and in others artificially low.  We disagree.  The KPMG model calls for calculating payment rates each month.  Therefore, the process takes into account seasonality effects by calculating a new payment rate every month.  Payment rates may have been higher in April and lower in December, but the KPMG model takes that into account by changing the present value of the debt instrument as the payment rates change.  We conclude that, in this respect, the KPMG model is reasonable and clearly reflected COB's income.

F.   Conclusion With Respect to the Calculation of OID

Although COB may enjoy some latitude in its method of calculating the accrual of OID, it may not run afoul of section 1272 and the OID regulations.  We conclude that COB may not include new additions, as defined in the KPMG model, in the beginning issue price of the monthly pool of debt instruments.  Further, COB's calculations of the payment rate run afoul of section 1272 by applying payments first to accrued, but unbilled, finance charges.  Lastly, the denominator of the payment rate calculation may not include new additions because those additions were not billed to the cardholders and should not have been included in the beginning issue price.  We conclude that, in all other respects, the KPMG model is reasonable.

Issue 3:  Milesone Rewards

FINDINGS OF FACT

A.   The Milesone Reward Program

In an effort to attract new cardholders and to encourage cardholders to use their cards more often, Capital One issued Milesone credit cards, Signature Milesone credit cards, and Small Business Milesone credit cards (collectively Milesone cards).  The Milesone cards were typical Visa and MasterCard credit cards (as described above) except that they allowed a cardholder to earn "miles" which could be redeemed for airline tickets.

A Milesone cardholder paid Capital One an annual membership fee of either $19 or $29. In exchange for that fee, a Milesone cardholder earned 1 mile for every dollar charged on the Milesone card for purchases. However, a cardholder was limited to 10,000 miles per billing cycle. Additionally, a cardholder could earn up to 3,000 miles by transferring an existing balance from a non-Capital One credit card account to a Milesone account. A Milesone cardholder earned no miles for cash advances, checks, or fees of any kind, including finance charges.

Capital One provided Milesone cardholders with a rewards schedule detailing the number of miles needed to qualify for the various airline tickets offered. Once enough miles were accumulated, the cardholder could redeem the miles for a round-trip airline ticket purchased by Capital One. The least expensive ticket was a round-trip coach ticket within the cardholder's zone (either the eastern, middle, or western United States) and required 18,000 miles. In comparison, a round-trip coach ticket from the United States to Europe required 50,000 miles, and an around-the-world coach ticket required 150,000 miles. Business class and first class tickets were also available but required more miles than similar coach tickets.

Capital One provided each Milesone cardholder a quarterly statement reflecting the cardholder's total accumulated points, the number of points redeemed for airline tickets, and the number

of points due to expire within 90 days.  Points not redeemed within 5 years of the end of the quarter in which they were earned expired at that time.  Points were redeemed on a first-in, first-out basis; i.e., the oldest points were redeemed first.

Capital One purchased the airline tickets from a vendor. Each class of ticket was assigned a value.  For example, a cardholder redeeming 18,000 miles for an in-zone domestic ticket could request a ticket costing up to $360.  A cardholder redeeming 50,000 miles for a United States to Europe ticket could request a ticket costing up to $1,000.  Therefore, Capital One's maximum potential cost per mile was 2 cents.

B.    Milesone Program Costs and Accounting

Capital One estimated its cost of redeeming its cardholders' miles.  The estimates depended primarily on two variables:  (1) The estimated rate of future redemptions and (2) the estimated average cost of redemption.  These variables were used to calculate an accrual rate used to estimate Capital One's future airline ticket redemption costs for financial accounting purposes. The accrual rate was a percentage of outstanding accumulated Milesone miles at the end of the year.

As of December 31, 1998, Milesone cardholders had an outstanding accumulated balance of 58,370,500 miles.[37]  Capital

_____

[37]In 1998 and 1999 Capital One awarded 29,254,871 and 323,169,272 miles in connection with balance transfers and bonus
(continued...)

One estimated that 70 percent of the miles would ultimately be redeemed and that each mile would cost 1.4 cents to redeem. Using these figures, Capital One estimated its future redemption costs to be $583,411.[38] This amount was used as its contingent reserve for redemption costs on its general ledger for financial accounting purposes and was deducted under section 1.451-4, Income Tax Regs., on petitioners' consolidated 1998 Federal income tax return.[39]

As of December 31, 1999, Milesone cardholders had an outstanding accumulated balance of 2,661,038,279 miles. Capital One estimated that 80 percent of these miles would be redeemed and that each mile would cost 1.65 cents to redeem. Accordingly, Capital One estimated its future redemption costs to be $34,593,497.[40] The difference between that figure and the 1998 figure, $583,411, was the change in the contingent reserve for future redemption costs. Capital One deducted the difference,

---

[37](...continued)
miles. The record is not clear about what constituted bonus miles.

[38]We note that the 70 percent and 1.4 cents figures would result in a slightly higher cost of redemption. We assume the parties rounded the figures for our benefit. In any event, the discrepancy does not appear to bother the parties, and therefore it does not bother us.

[39]Capital One actually spent $1,578 and $313,513 to redeem Milesone miles during 1998 and 1999, respectively.

[40]Again, the 80 percent and 1.65 cents figures would result in a slightly higher cost of redemption.

$34,010,086, on its general ledger for financial accounting purposes. Through an error petitioners neglected to deduct that amount on their consolidated 1999 Federal income tax return. During the IRS' examination and in its petition to this Court, Capital One asserted that it was entitled to the deduction under section 1.451-4, Income Tax Regs.

The actual redemption rates of points earned by cardholders in 1998 and 1999 through their 5-year expiration period were 68 percent and 81 percent, respectively. The actual cost of redemption was just over 2 cents per mile for points earned in 1998 and 1.59 cents per mile for those earned in 1999.[41]

OPINION

A.   The History of Accounting for the Redemption of Trading Stamps and Coupons

Whether a business expense has been incurred so as to entitle an accrual basis taxpayer to deduct it under section 162(a) is governed by the all events test. United States v. Anderson, 269 U.S. 422, 441 (1926). In Anderson, the Supreme Court held that a taxpayer was entitled to deduct from its 1916 income a tax on profits from munitions sales that took place in 1916. Although the tax would not be assessed and therefore would not formally be due until 1917, all the events had occurred in 1916 to fix the amount of the tax and to

--------

[41]Petitioners did not explain why the cost of redemption was more than the ostensible maximum payout of 2 cents per mile.

determine the taxpayer's liability to pay it.  The all events test is now embodied in section 1.461-1(a)(2), Income Tax Regs., which during the years at issue provided:

> Under an accrual method of accounting, a liability (as defined in § 1.446-1(c)(1)(ii)(B)) is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability. * * *

See also sec. 461(h) (providing that the all events test shall not be treated as met any earlier than when economic performance occurs);[42] United States v. Gen. Dynamics Corp., 481 U.S. 239, 242-243 (1987).

In 1919 the Commissioner carved out an exception to the all events test, allowing a taxpayer to deduct from its sales revenues an estimate of the contingent liabilities incurred with respect to the redemption of coupons or trading stamps issued with those sales.

> Where a taxpayer, for purposes of promoting his business, issues with sales trading stamps or premium coupons redeemable in merchandise or cash, he should in computing the income from such sales subtract only the amount received or receivable which will be required for the redemption of such part of the total issue of trading stamps or premium coupons issued during the taxable year as will eventually be presented for

---

[42]Sec. 461(h)(5) provides an exception to the general rule of sec. 461(h), allowing a deduction for a reserve for estimated expenses if such a deduction is otherwise allowable under the Code.

redemption.  This amount will be determined in the light of the experience of the taxpayer in his particular business and of other users engaged in similar business. * * *

Regs. 45, art. 88 (1919).  Ninety years later, the essential elements of the exception still remain and are embodied in section 1.451-4(a)(1), Income Tax Regs., which for the years at issue provided:

If an accrual method taxpayer issues trading stamps or premium coupons with sales, or an accrual method taxpayer is engaged in the business of selling trading stamps or premium coupons, and such stamps or coupons are redeemable by such taxpayer in merchandise, cash, or other property, the taxpayer should, in computing the income from such sales, subtract from gross receipts with respect to sales of such stamps or coupons (or from gross receipts with respect to sales with which trading stamps or coupons are issued) an amount equal to--

(i) The cost to the taxpayer of merchandise, cash, and other property used for redemption in the taxable year,

(ii) Plus the net addition to the provision for future redemptions during the taxable year (or less the net subtraction from the provision for future redemptions during the taxable year).

The regulation's purpose is to match sales revenues with the expenses incurred in generating those revenues, and taxpayers are entitled to a present deduction for only that portion of the stamps or coupons that they expect to eventually be redeemed. See Mooney Aircraft, Inc. v. United States, 420 F.2d 400, 411 (5th Cir. 1969); Tex. Instruments, Inc. v. Commissioner, T.C. Memo. 1992-306.

Petitioners contend that the miles Capital One issued to its cardholders are coupons issued with sales, that those coupons are redeemable by the cardholders in property, and that therefore it may subtract from its gross receipts the estimated cost of redeeming those miles. Respondent agrees that the miles are coupons within the meaning of section 1.451-4, Income Tax Regs., but disagrees that the miles are issued with sales and that Capital One had gross receipts with respect to sales.

B.  The "With Sales" Requirement

Over the years we have been asked to interpret and apply section 1.451-4, Income Tax Regs., and its predecessors. In Creamette Co. v. Commissioner, 37 B.T.A. 216 (1938), the taxpayer created a program to increase sales of its macaroni product. It issued with each carton of its product sold one coupon which was redeemable for certain selected articles of merchandise. The Board of Tax Appeals, predecessor to this Court, allowed the taxpayer to deduct a reasonable estimate of its future cost of redemption under Regs. 77, art. 335, a predecessor to section 1.451-4, Income Tax Regs. Creamette Co. v. Commissioner, supra at 218. In Brown & Williamson Tobacco Corp. v. Commissioner, 16 T.C. 432 (1951), to spur sales of its cigarettes, the taxpayer issued coupons with each pack of its cigarettes sold which could be redeemed for merchandise or cash. We allowed the taxpayer to

deduct the reasonable estimate of its future cost of redemption. Id. at 445-446.

In Tex. Instruments, Inc. v. Commissioner, supra, the taxpayer did not include coupons on the product sold in the same way as the taxpayers in Creamette and Brown & Williamson but rather placed coupons in stores and in newspaper and magazine advertisements. To redeem the coupon, the consumer was required to submit to the taxpayer an original sales receipt and some additional type of proof of purchase, such as a part of the product box. The Commissioner contended that the taxpayer's coupons were merely advertisements inducing customers to purchase its products and were not issued with sales within the meaning of section 1.451-4, Income Tax Regs. We disagreed and held that, for purposes of section 1.451-4, Income Tax Regs., the proofs of purchase, such as part of the product's box, functioned as coupons issued with sales of the product.

In Tex. Instruments, there was no dispute that sales took place. The issue was whether coupons were issued with those sales. If the coupon, for purposes of section 1.451-4, Income Tax Regs., was the advertisement, it would not have been issued with the sale. The issue in this case is different. Although respondent argues that the miles were not issued with sales, the focus of his argument is that there were no sales with which coupons could be issued.

Although most credit card transactions involve sales of goods or services, i.e., a consumer purchases a product from a merchant, petitioners do not argue that the merchant's sale of goods to the cardholder is relevant for purposes of section 1.451-4, Income Tax Regs. Rather, petitioners argue that when a cardholder uses a Milesone card, Capital One has sold its lending services to the cardholder and issued miles with that sale. Respondent concedes that "sales" as used in section 1.451-4, Income Tax Regs., is broad enough to include the sale of services as well as the sale of goods.

Petitioners argue that we have interpreted the term "service" to include the lending of money. In <u>Burbank Liquidating Corp. v. Commissioner</u>, 39 T.C. 999 (1963), affd. in part and revd. in part on other grounds 335 F.2d 125 (9th Cir. 1964), we faced the question of whether a lender's mortgage loans made in the ordinary course of business were ordinary or capital assets under section 1221(4).[43] We held that the loans were "notes receivable acquired for * * * services rendered" and thus were ordinary, rather than capital assets. <u>Id.</u> at 1009. We explained that "the business of a savings and loan company could properly be described as 'rendering the service' of making loans." <u>Id.</u> at 1009-1010.

---

[43]Sec. 1221(4) of the Internal Revenue Code of 1954 excluded from capital assets: "accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property".

In FNMA v. Commissioner, 100 T.C. 541, 576-578 (1993), we faced a similar question with respect to the character of home mortgage loans. However, the lender had not originated the loans but had purchased them on the secondary market. Nevertheless, we held that "the actual operation of * * * [the taxpayer's business] further supports that it was providing a service in exchange for the mortgages." Id. at 578.

Petitioners argue that these cases indicate that the lending of money is the sale of a service and therefore when Capital One extends credit to its cardholders, it is selling lending services to the cardholder. The argument is strained. The cases cited by Capital One and discussed above are inapplicable to the current case. Whether loans in the hands of a lender are a capital or ordinary asset has no bearing on whether Capital One issued its miles with sales. In lending its cardholders funds, Capital One provided a service, but that service does not transform a loan into a sale within the meaning of section 1.451-4, Income Tax Regs. The regulation encompasses a sale of services, but it does not follow that every provision of services is a sale of services.

A sale requires two parties, a buyer and a seller. See U.C.C. sec. 2-106(1) (2008); Commissioner v. Freihofer, 102 F.2d 787, 789-790 (3d Cir. 1939) (a "sale" requires parties standing to each other in the relation of buyer and seller, assent of the

minds to the same proposition, and passing of consideration), affg. <u>Greisler v. Commissioner</u>, 37 B.T.A. 542 (1938). Section 1.451-4, Income Tax Regs., allows a seller a current deduction for estimated future expenses. In a lending transaction, such as the extension of credit to a cardholder, the cardholder has not bought lending services from the lender and the lender has not sold lending services to the cardholder. In fact, as argued by petitioners on the interchange issue, with respect to a credit card purchase transaction the lender is the buyer, having purchased a note receivable.

C.    Gross Receipts With Respect to Sales

Section 1.451-4(a)(1), Income Tax Regs., allows the deduction of contingent liabilities from "gross receipts with respect to sales with which trading stamps or coupons are issued". Section 1.451-4, Income Tax Regs., contemplates a scenario where the expenses are contingent, but the gross receipts are not. The revenue from a sale is known at the time of sale and is the purchase price.

With respect to credit card transactions, Capital One receives various types of revenue when it lends money to its cardholders. The first income received is from interchange, which is a small percentage of the amount lent. Interchange is known at the time of sale, but interchange is not a fee for any

service other than the lending of money, and the lending of money is not a sale of a loan or lending services.

Capital One receives much of its income from finance charges on cardholder loans. Finance charges are charged to the cardholder only if the cardholder does not pay the monthly balance in full within the grace period. A cardholder may pay interest with respect to the loan for many months or even many years. Similarly, a cardholder may incur late fees if a timely payment is not made. A late fee may be incurred with respect to the first bill Capital One sends the cardholder or with respect to a bill sent many months or years later if the cardholder has not repaid the loan in full.

Many other variables may affect the revenues Capital One receives with respect to its loan to the cardholder. Capital One may alter interest rates. The cardholder may default on the loan, exceed the credit limit and incur an overlimit fee, or incur an insufficient funds fee if a check paid to Capital One is not honored by the cardholder's bank. Although these revenues are related to Capital One's lending to its cardholders, they are not "gross receipts with respect to sales with which * * * coupons are issued" within the meaning of section 1.451-4(a)(1), Income Tax Regs. Capital One did not issue miles with respect to the revenues Capital One earned, with the arguable exception of

interchange.[44]  Miles were issued only for the amount of the cardholder's purchase, and a cardholder earned no miles for finance charges or any fees incurred.  In short, interest, interchange, and the various fees a cardholder may incur are not sales revenues, and the purpose of the regulation is to match sales revenues with the expenses associated with the sale, specifically the cost of coupon redemption.  <u>Mooney Aircraft, Inc. v. United States</u>, 420 F.2d at 411.

D.    <u>Conclusion With Respect to the Milesone Rewards Issue</u>

Petitioners argue that deducting Capital One's estimated cost of redemption would most clearly reflect its income without undue distortion.  With respect to the Milesone program, for book purposes Capital One estimated its future liability for airline tickets at $583,411 and $34,010,086 in 1998 and 1999, respectively.  Respondent agrees that the estimates are reasonable.  However, the reasonableness of the estimates and the economics of the Milesone program are irrelevant because the miles were not issued with sales and therefore, the requirements of section 1.451-4, Income Tax Regs., have not been met.  Accordingly, the all events test applies, limiting Capital One's deduction for airline tickets with respect to the Milesone

---

[44]The number of miles issued had no direct relationship to the amount of interchange Capital One earned.

program to those amounts which are fixed and known and for which economic performance has occurred.[45]

In reaching our holdings on all three issues, we have considered all arguments made, and to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

---

[45]Because we hold that the Milesone coupons were not issued "with sales" as required by sec. 1.451-4, Income Tax Regs., we need not address respondent's alternative arguments that: Capital One failed to attach the informational statement required by sec. 1.451-4(e), Income Tax Regs., explaining how the future redemption expenses were calculated; the airline tickets were not "other property"; and the Milesone Program was impermissibly conditional in that Capital One could terminate the program at any time.